

Opinions of the United
States Court of Appeals
for the Third Circuit

2-23-1998

# Sabo v. Metropolitan Life

Precedential or Non-Precedential:

Docket 96-3663

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Sabo v. Metropolitan Life" (1998). *1998 Decisions.* Paper 33.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/33

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 23, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-3663

RICHARD SABO,
        Appellant

v.

METROPOLITAN LIFE INSURANCE COMPANY; GARY
ANTONINO; JOEL SHERMAN; RONALD SCHRAM; UNITED
FOOD AND COMMERCIAL WORKERS INTERNATIONAL
UNION, AFL-CIO, CLC.

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No 94-cv-00307)

Argued October 16, 1997

Before: STAPLETON, ALITO, and SEITZ, Circuit Judges.

(Opinion Filed: February 23, 1998)

        Stanley M. Stein, Esquire (Argued)
        Michelle S. Katz, Esquire
        Jeffrey B. Yao, Esquire
        Feldstein, Grinberg, Stein & McKee
        428 Boulevard of the Allies
        Pittsburgh, PA 15219
         ATTORNEYS FOR APPELLANT
         RICHARD SABO

Frederick N. Egler, Jr., Esquire
  (Argued)
J. Stephen Purcupile, Esquire
Egler, Garrett & Egler
428 Forbes Avenue
2100 Lawyers Building
Pittsburgh, PA 15219
 ATTORNEYS FOR APPELLEE
 METROPOLITAN LIFE INSURANCE
 COMPANY

Kim M. Watterson, Esquire
Richard M. Smith, Esquire
Katarincic & Salmon
625 Liberty Avenue
2600 CNG Tower
Pittsburgh, PA 1522
 ATTORNEYS FOR APPELLEE
 GARY ANTONINO

OPINION OF THE COURT

Seitz, Circuit Judge.

This appeal primarily presents an issue that divides sister Courts of Appeals and is of first impression in our court -- namely, whether the McCarran Ferguson Act, 15 U.S.C. SS 1011-1015 (1994) ("The Act"), precludes a cause of action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. SS 1961-1968 (1994), where the challenged predicate acts arise out of the defendant's insurance business. The district court exercised jurisdiction over plaintiff 's federal claims pursuant to 28 U.S.C. S 1331 and over supplemental state tort claims under 28 U.S.C. S 1367. Our appellate jurisdiction arises under 28 U.S.C. S 1291 to review the district court's final orders.

I. Factual Background

The Metropolitan Life Insurance Company ("MetLife") terminated the employment of Richard Sabo as an

2

insurance sales agent in alleged retaliation for his refusal to participate in illegal trading activity. Mr. Sabo ("Plaintiff ") then sued MetLife and several MetLife employees ("Antonino", "Sherman", and "Schram") in the district court, alleging causes of action under RICO as well as a claim based on the common law tort of defamation. In particular, the complaint recited the existence of three predicate acts under RICO: (1) a "churning" scheme, whereby MetLife encouraged and coerced agents to fraudulently trade insurance policies in order to accumulate commissions and decrease the value of outstanding policies; (2) a "50/50" insurance plan that MetLife fraudulently advertised as a retirement savings plan; and (3) an organized poli cy of intimidation and harassment by MetLife management directed toward its insurance agents to participate in these fraudulent activities.

The district court first granted a motion by all defendants to dismiss the RICO claims on the ground that the McCarran-Ferguson Act precluded such claims where the causes of action arose from MetLife's insurance business. At the close of discovery, the district court, under a summary judgment standard, dismissed the remaining defamation action on the ground that the alleged defamatory statements were not sufficiently directed toward the plaintiff so that a jury could reasonably conclude that they referred to him. Plaintiff now appeals these two orders.

II. The McCarran-Ferguson Act

Because the central issue in plaintiff 's RICO claims implicates an application of the McCarran-Ferguson Act, we turn first to that Act. Our standard of reviewing the district court's grant of a motion to dismiss is plenary. Chester County Intermediate Unit v. Pennsylvania Blue Shield, 896 F.2d 808, 810-811 (3d Cir. 1990).

Section 2 of the Act, codified at 15 U.S.C. S 1012, reads as follows:

> Regulation by State law; Federal law relating specifically to insurance; applicability of certain Federal laws after June 30, 1948

(a) State regulation. The business of insuranc e, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

(b) Federal regulation. No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: Provided, That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law.

The stated purposes of the Act, as expressed in section 1, are to leave regulation and taxation of the insurance business to the states and to ensure that "silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States." 15 U.S.C. S 1011.

In considering the defendants' motion to dismiss the RICO claims, the district court adopted a four-part test announced in Wexco Inc. v. IMC, Inc., 820 F.Supp. 194, 198 (M.D.Pa. 1993) which provides that the McCarran-Ferguson Act precludes federal litigation if:

(1) the federal statute under which the allegedly precluded action is brought ... does not specifically relate to the "business of insurance"; (2) the complained-of activities constitute the "business of insurance"; (3) the relevant state has enacted laws for the purpose of regulating these complained-of activities; and (4) the application of the federal statute would, "invalidate, impair[,] or supersede" such laws.

Applying this test, the district court held that RICO does not specifically relate to the business of insurance, thus satisfying the first element of preclusion. As to the second element, the district court found that the plaintiff's

4

complained-of activities did indeed constitute activity within the "business of insurance." Although plaintiff's complaint alleged fraud and coercion under RICO, the district court reasoned that the defendants' "underlying activity" involves the "promotion and sale of insurance policies to MetLife customers," which is central to the insurance business. Next, the district court found that Pennsylvania had enacted a comprehensive system of insurance regulation so that the third element of the preclusion analysis was met. Finally, the district court held that the application of RICO in an insurance context would "invalidate, impair, or supersede" Pennsylvania's insurance laws. The court arrived at this conclusion by comparing the remedial provisions of civil RICO (namely treble damages, attorney's fees, and costs) with Pennsylvania's insurance laws primarily providing for administrative remedies. It thus reasoned that all the elements of preclusion under the McCarran-Ferguson Act were satisfied which mandated a dismissal of the plaintiff's RICO claims.

The parties to this appeal focus their arguments on two rulings of the district court. First, they disagree as to the scope of the "insurance business" covered by the statute, and whether it applies to the conduct alleged in the complaint. Plaintiff emphasizes that the alleged predicate acts of racketeering activity stem from systematic behavior of "coercive and intimidating tactics" and thus cannot be construed to embrace the business of insurance. Defendants, on the other hand, assert that plaintiff's complaint necessarily relates to the insurance business because it attacks the heart of the insurance industry -- specifically, how MetLife manages the licensing of its agents, the agents' authority to solicit insurance, and how agents receive commissions.

Second, both sides contest the proper construction of the "invalidate, impair, or supersede" phrase in 15 U.S.C. S 1012(b) quoted above. Plaintiff urges this court to adopt a "direct conflict" test, in which a federal statute would not "invalidate, impair, or supersede" a state law unless the federal legislation directly conflicts with substantive duties governed by state insurance law. Conversely, the defendants argue that any analysis of the Act's impairment

5

should not focus on substantive conflict but instead should compare the plaintiff's broad federal RICO remedies with the exclusively administrative scheme adopted under Pennsylvania insurance laws. We will address these two arguments in turn.

## A. Preclusion Analysis Under the McCarran–Ferguson Act

As with any other issue of statutory construction, the starting point in the Act's interpretation is the language of the statute itself. Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 210 (1979). Section 2(a) of the statute, by its terms, affirmatively subjects the business of insurance to state regulation. 15 U.S.C. S 1012(a). The statute then takes the further step of proscribing unintended federal interference of state insurance laws by a general mandate that no federal law "shall . . . invalidate, impair, or supersede" any state law enacted "for the purpose of regulating the business of insurance." 15 U.S.C. S 1012(b). This preclusionary mandate does not apply when the federal statute in question "specifically relates to the business of insurance," in which case normal supremacy rules control and the federal statute trumps conflicting state law.[1]

The Supreme Court has extensively reviewed the Act's legislative history, see, e.g., United States Dep't of the Treasury v. Fabe, 508 U.S. 491, 499–500 (1993), Securities and Exchange Comm'n v. National Securities, Inc., 393 U.S. 453, 458–59 (1969), and has fully explained the legislative intent behind the statute's preclusionary approach to federal intrusion on state insurance laws:

> [C]ongress' purpose was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance. This was done in two

---

1. Because the plaintiff 's complaint is not grounded in federal antitrust laws, we focus our analysis on the first clause of section 1012(b). As the Supreme Court noted, the language of the Act distinguishes preclusion analysis where antitrust laws are at issue. United States Dep't of the Treasury v. Fabe, 508 U.S. 491, 504 (1993).

ways. One was by removing obstructions which might be thought to flow from its own power, whether dormant or exercised, except as otherwise provided in the Act itself or in future legislation. The other was by declaring expressly and affirmatively that continued state regulation and taxation of this business is in the public interest and that the business and all who engage in it "shall be subject to" the laws of the several states in these respects.

Prudential Ins. Co. v. Benjamin, 328 U.S. 408, 429-30 (1946) (footnote omitted); see also Lac D'Amiante du Quebec, Ltee v. American Home Assurance Co., 864 F.2d 1033, 1038-39 (3d Cir. 1988).

If it is determined that the alleged conduct at issue broadly constitutes the "business of insurance," and is therefore subject to state regulation under section 1012(a), the next issue is whether the anti-preemption mandate of section 1012(b) precludes a federal cause of action. Here, the statute makes clear that a party is barred from suing under federal law if three distinct requirements are met. First, the federal law at issue does not "specifically relate" to the business of insurance. Second, the state law regulating the challenged conduct was "enacted for the purpose of regulating the business of insurance." Finally, an application of federal law would "invalidate, impair, or supersede" such state law.2 Fabe, 508 U.S. at 501.

_____

2. We note at the outset that federal courts have seemingly disagreed as to the proper analytic inquiry into McCarran-Ferguson Act preclusion. See, e.g., Dornberger v. Metropolitan Life Ins. Co. , 961 F.Supp. 506, 516 n.4 (S.D.N.Y. 1997); Ambrose v. Blue Cross & Blue Shield of Virginia, Inc., 891 F.Supp. 1153, 1158 n.4 (E.D. Va. 1995), aff'd, 95 F.3d 41 (4th Cir. 1997) (unpublished per curiam). Some courts draw upon a four-part inquiry similar to that used by district court and the Wexco court. See Kenty v. Bank One, Columbus, N.A., 92 F.3d 384, 391-92 (6th Cir. 1996); American Deposit Corp. v. Schacht, 84 F.3d 834, 838-43 (7th Cir. 1996); Merchants Home Delivery Service, Inc. v. Frank B. Hall & Co., 50 F.3d 1486, 1489 (9th Cir. 1995); Cochran v. Paco, Inc. 606 F.2d 460, 464 (5th Cir. 1979). Other courts have announced a more truncated three-part test that does not require a specific conclusion that the defendant's conduct constitutes the business of insurance. See Doe v. Norwest Bank Minn., 107 F.3d 1297, 1305 n.8 (8th Cir. 1997); United States. v. Rhode Island Insurers' Insolvency Fund, 80 F.3d 616, 619 (1st Cir. 1996). Because of this apparent divergence, it is important to discuss our analysis in detail.

The threshold question in determining whether the anti-preemption mandate of 15 U.S.C. S 1012(b) applies is whether the challenged conduct broadly constitutes the "business of insurance" in the first place. 15 U.S.C. S 1012(a). If the contested activities are wholly unrelated to the insurance business, then the McCarran-Ferguson Act has no place in analyzing federal regulation because only when "[insurance companies] are engaged in the `business of insurance' does the act apply." National Securities, 393 U.S. at 459-60.

In addressing the issue of preclusion under S 1012(b), we read no more into the statute than what it says: unless a federal law specifically relates to the business of insurance, it will not be applied when it "invalidates, impairs, or supersedes" a state law "enacted for the purpose of regulating the business of insurance." If the defendant's conduct does not constitute "the business of insurance," then the Act simply does not apply and there is no need to confront preclusion issues under S 1012(b). We cannot imagine how section 1012(b) protects a state law enacted for the purpose of regulating the insurance business when the activity in question does not relate to insurance. To hold otherwise would require us to abandon the structure and purpose of the McCarran-Ferguson Act.

Our reading of the Act is amply supported by its legislative history and Supreme Court precedent. As explained by the Supreme Court:

> The statute did not purport to make the States supreme in regulating all the activities of insurance companies; its language refers not to the persons or companies who are subject to state regulation, but to laws "regulating the business of insurance." Insurance companies may do many things which are subject to paramount federal regulation; only when they are engaged in the "business of insurance" does the statute apply. Certainly the fixing of rates is part of this business. . . . The selling and advertising of policies, and the licensing of companies and their agents are also within the scope of the statute. Congress was concerned with the type of state regulation that centers around the contract of insurance, the transaction

8

which [the Court has previously held] was not "commerce." The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement--these were the core of the "business of insurance." Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was--it was on the relationship between the insurance company and the policyholder. Statutes aimed at protecting or regulating this relationship, directly or indirectly are laws regulating the "business of insurance."

National Securities, 393 U.S. at 459-60 (citations omitted). Thus, under S 1012(a), the Act initially recognizes that regulating the "business of insurance" rests in the hands of the states.

Of these state "laws relat[ing] to the regulation or taxation" of the insurance business, 15 U.S.C. S 1012(a), the next subsection protects from federal preemption a special class of state laws "enacted . . . for the purpose of regulating the business of insurance." 15 U.S.C. S 1012(b). But as explained by the Supreme Court, the categories of laws protected by S 1012(b) "necessarily encompasses more than just the `business of insurance' " and include those laws that possess the " `end, intention, or aim' of adjusting, managing, or controlling the business of insurance." Fabe, 508 U.S. at 505 (citation omitted). The focus of section 1012(b) is not directed toward the business of insurance itself, but rather toward a certain subset of laws relating to insurance regulation under section 1012(a). That demarcation line is found in S 1012(b) as laws "enacted . . . for the purpose of regulating the business of insurance." Thus, even though the state has a law regulating the challenged activity, a court must still address whether that law was meant to fall within the ambit of the Act's protection. This is achieved by deciding whether the activity in question constitutes the business of insurance and whether the specific state law was enacted with the " `end, intention, or aim' of adjusting, managing, or controlling the business of insurance." Fabe, 508 U.S. at 505.

9

B. Application of the McCarran-Ferguson Act

We first ask whether the challenged activity alleged in the complaint constitutes the "business of insurance" in order to determine whether the Act applies. The Supreme Court has provided guidance as to what conduct falls within "business of insurance" for purposes of the McCarran-Ferguson Act. In National Securities, the Court held that the core of the insurance business "centers around the contract of insurance." 393 U.S. at 460. The Court further set forth typical activity that would unquestionably constitute the business of insurance: "[t]he relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement." Id.

Similarly, in Group Life & Health Ins. Co. v. Royal Drug Co., the Supreme Court formulated a three part inquiry in interpreting the phrase "business of insurance": (1) whether the practice has the effect of transfe rring or spreading a policyholder's risk; (2) whether the p ractice is an integral part of the policy relationship between the insurer and the insured; and (3) whether the pract ice is limited to entities within the insurance industry. 440 U.S. 205, 211-21 (1979); see also Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 129 (1982). While this inquiry was directed to the antitrust clause in section 1012(b), it may nevertheless provide guidance in a more generalized analysis under this Act. See Fabe, 508 U.S. 503-504.3

In this case, we agree with MetLife and its named employees that their activity constitutes the business of insurance. The challenged conduct appearing in the plaintiff 's complaint unquestionably centers around the insurance contract, and specifically the activities surrounding its sale and marketing. MetLife's "50/50 plan,"

_____

3. Some courts have concluded that this three part test is simply not relevant in determining what constitutes the business of insurance in a non-antitrust context. See, e.g., Doe, 107 F.3d at 1305 n.8. We disagree. As Fabe makes clear, the Royal Drug test is only a starting point in the analysis for non-antitrust cases. 508 U.S. at 503-5. However, because laws "enacted . . . for the purpose of regulating the business of insurance" necessarily encompass more than just the insurance business, the analysis here is broader.

10

"churning" trades, and management's organized intimidation of sales agents, all strike at the insurance business "core" enumerated in National Securities because they directly impact on the sale of insurance policies and ultimately affect the relationship between insurer and insured. 393 U.S. at 460. Indeed, whatever the precise contours of the insurance business phrase may be, there is nothing more basically "insurance" than the sale of an insurance contract and the insurer's unique approach in trading, advertising, or valuing that product. We need not delve into a sophisticated three part analysis under Royal Drug or Pireno to reach this conclusion, but instead look to the defendants' conduct to ascertain whether it centers around the contract of insurance and the relationship between insurer and insured.

Plaintiff's assertion that the challenged activity cannot constitute the business of insurance because it is illegal is unpersuasive. By pointing to a practice that may violate federal law, and claiming that it is not the "business of insurance," plaintiff demonstrates a fundamental misunderstanding of the Act. The language and purpose of the Act speak not of legal insurance transactions, but instead seek to allow states to regulate and enforce the insurance business without fear of unintended federal interference. We agree with the Court of Appeals for the Ninth Circuit that if we were to construe the "business of insurance" phrase by reference to federal legality, the statute would be read out of existence. Merchants, 50 F.3d at 1490. As noted by the Seventh Circuit Court of Appeals, "it is not helpful to point to a practice forbidden by federal law . . . and observe that this practice is not itself insurance." NAACP v. American Family Mut. Ins. Co., 978 F.2d 287, 294 (7th Cir. 1992). It is not surprising, therefore, that the majority of courts have rejected this same argument advanced here by the plaintiff, and so do we. See Dornberger, 961 F.Supp. at 517 (surveying cases).

C. Preclusion of RICO Claims Under the McCarran–Ferguson Act

Having found that the activity challenged in the complaint constitutes the business of insurance, and is

11

therefore within the ambit of the Act, we consider whether plaintiff 's RICO cause of action is precluded under S 1012(b). No party to the appeal argues that RICO specifically relates to insurance. Indeed, virtually every court considering this issue has held that RICO is not a federal statute exempt from the McCarran-Ferguson Act. See, e.g., Kenty, 92 F.3d at 391; Merchants, 50 F.3d at 1489; Dornberger, 961 F.Supp. at 516. Nor is it disputed that the applicable Pennsylvania insurance statute is a state law enacted for the purpose of regulating the insurance business. Thus, all that is left for us to consider under the Act is whether an application of RICO to the instant case would "invalidate, impair, or supersede" state law.

1. Pennsylvania Insurance Laws and RICO

In order to determine whether a cause of action under RICO would "invalidate, impair, or supersede" Pennsylvania insurance law, we must initially juxtapose RICO with a specific state law enacted for the purpose of regulating the insurance business. The district court, along with both sides on appeal, point to Pennsylvania's Unfair Insurance Practices Act, 40 Pa. Cons. Stat. Ann. SS 1171.1 to 1171.15 (West 1992) ("UIPA"), as the relevant state law governing MetLife's challenged activity. The Act prohibits persons from engaging in unfair or deceptive practices in the business of insurance. Id. S 1171.4. An exhaustive list of activity is set forth in section 1171.5 as deceptive or unfair practices forbidden under section 1171.4. The UIPA further empowers the Pennsylvania insurance commissioner to investigate illegal insurance practices and to take certain remedial actions including the imposition of monetary penalties, "cease and desist" orders, the suspension or revocation of an insurance license, or additional injunctive relief. Id. SS 1171.7 to 1171.11.

By judicial precedent, the Pennsylvania Insurance Commissioner alone may seek to enforce the UIPA. See Wright v. North Am. Life Assurance Co., 372 Pa. Super. 272, 279, 539 A.2d 434, 438 (1988) ("[T]he provisions of this statute were not intended to confer a right of private action. Rather, the Unfair Insurance Practices Act vests

enforcement powers in the Pennsylvania Insurance 539<!>Commissioner."); Wexco, 820 F.Supp. at 203-204.

Pennsylvania courts, however, have not barred common law actions for fraud and deceit arising out of insurance practices even though the UIPA does not allow private causes of action. Wright, 372 Pa. Super. at 279, 539 A.2d at 438. These private lawsuits, in addition to other private actions authorized by Pennsylvania law,[4] provide the only judicial remedies available to plaintiffs victimized by illegal insurance practices.

RICO, on the other hand, grants a private cause of action to any person injured as a result of a pattern of racketeering activity. 18 U.S.C. S 1964(c). The statute also authorizes the award of treble damages, attorney's fees, and costs. Id. Pursuant to 18 U.S.C. S 1961(2), a pattern of racketeering activity is defined as at least two acts of illegal activity identified in section 1961(1) and includes both mail fraud and wire fraud. Beyond the general classes of crimes enumerated in section 1961(1), RICO does not specifically address insurance practices.

2. "Invalidate, Impair, or Supersede"

Given this comparison of RICO with the UIPA, the legal question before us is whether allowing plaintiff 's suit under RICO would "invalidate, impair, or supersede" Pennsylvania law as that phrase is understood under the Act. The phrase "invalidate, impair, or supersede" is not defined anywhere in the Act and we are faced with the considerable task of grappling with its construction in the present context.

Courts of Appeals jurisprudence is in disarray as to the extent and meaning of invalidate, impair, or supersede under the Act. One line of cases, spearheaded by thefirst, seventh, and ninth circuit Courts of Appeals, looks to a

_____

4. In addition to common law fraud and deceit, Pennsylvania courts have sanctioned the use of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Cons. Stat. Ann. SS 201-1 to 201-9.2 (West 1993), to allow aggrieved insureds recovery against insurance fraud. See Pekular v. Eich, 355 Pa. Super. 276, 285-90, 513 A.2d 427, 432-41 (1986).

13

direct conflict in the substantive provisions of the federal and state statutes at issue. See Merchants Home Delivery Service, Inc. v. Frank B. & Hall Co., 50 F.3d 1486, 1491–92 (9th Cir. 1995); NAACP v. American Family Mut. Ins. Co., 978 F.2d 287, 295–97 (7th Cir. 1992); Villafane–Neriz v. FDIC, 75 F.3d 727, 736 (1st Cir. 1996). These courts typically reason that the Act is a form of inverse preemption where federal laws must yield to state laws when the state enacts a statute for the purpose of regulating the insurance business and the federal statute does not specifically apply to insurance. Logic then drawn from ordinary rules of federal preemption under the supremacy clause is reversed so that a state law will not preempt a federal law unless the laws of both sovereigns directly conflict in terms of governing the behavior of insurance carriers. See American Family, 978 F.2d at 296 (citing Silkwood v. Kerr–McGee Corp., 464 U.S. 238 (1984)). The Act's preemption is appropriate, these courts will conclude, where it is simply not possible for the insurance carrier to comply with both state and federal law. However, because "duplication is not conflict," differences in state remedies and federal remedies could not be the basis of preemption when both statutes proscribe the same insurance practices. Id.

In further support for the foregoing analysis, these courts reason that the Act was not intended to cede the entire field of insurance regulation to the states. Where a state law or regulation is silent as to remedy, or does not provide a private cause of action, federal regulation will not be preempted. Merchants, 50 F.3d 1492. A contrary interpretation of the statute, these courts will conclude, would essentially rewrite the Act to read: No federal statute shall be construed to apply to the business of insurance, unless such federal statute specifically relates to the business of insurance. The Congress did not so provide and therefore state silence surrounding the assurance of a private remedy does not provide the basis for federal preemption. Id.

The fourth, eighth, and to a certain extent the sixth, circuit Courts of Appeals disagree. When state insurance laws provide for enforcement through an administrative process to the exclusion of private damage actions, treble

14

damages, attorney's fees, and costs, these courts reason that RICO's expanded remedial framework cannot coexist with state law based on a plain meaning of the words "invalidate," "impair," and "supersede."5 See Doe v. Norwest Bank Minn., 107 F.3d 1297, 1307 (8th Cir. 1997); Ambrose v. Blue Cross & Blue Shield of Virginia, Inc., 891 F.Supp. 1153, 1165 (E.D.Va. 1995), aff'd, 95 F.3d 41 (4th Cir. 1997) (unpublished per curiam). They say the Act was designed to allow state legislatures to adopt their own regulatory framework governing how insurance grievances are redressed. If a state chose a private forum for redress through administrative enforcement, then the Act would protect such a decision and federal law would not be allowed to upset this balance. Thus, they conclude that the drastic nature of federal remedies is directly relevant to assessing the application of the "invalidate, impair, or supersede" phrase in the Act. See Doe, 107 F.3d at 1307; Kenty v. Bank One, Columbus, N.A., 92 F.3d 384, 392 (6th cir. 1996).

To be sure, a direct conflict in the substantive provisions of RICO with those provided for in the UIPA would fall within the ambit of laws that invalidate, impair, or supersede state insurance law. If, for example, Pennsylvania explicitly authorizes certain insurance practices that RICO would clearly prohibit, the McCarran–Ferguson Act would eviscerate the federal cause of action. Cf. American Family, 978 F.2d at 297 ("If Wisconsin wants to authorize redlining, it need only say so; if it does, any challenge to that practice under the auspices of the Fair Housing Act becomes untenable."). This would be the case no matter how the phrase "invalidate, impair, or supersede" is to be construed, as we cannot imagine any more impairment then an absolute contradiction in legalfiat concerning insurance practices. But we cannot find any such conflict in the UIPA when compared to RICO, at least in the present context. Consequently, the more critical

_____

5. "Invalidate" is defined as "to weaken or make valueless"; "impair" means to "make worse . . . diminish in quantity, value, excellence or strength"; "supersede" means to "make obsolete, inferior, or outmoded". Webster's Third New International Dictionary 1199, 1131, 2295 (1986). See Ambrose, 891 F.Supp. at 1165.

issue is whether we may look to divergent state and federal implementation of similar legal norms.

Part of this puzzle has been answered by the Supreme Court in National Securities. There, the Securities and Exchange Commission sought to unwind a merger between two insurance companies based on violations of Rule 10b-5. The merger had already been approved by the Arizona State Director of Insurance in his capacity as licensor of insurers within the state. This approval was predicated upon a finding that the merger would not "substantially reduce the security of and service to be rendered to policyholders." 393 U.S. at 462 (quoting Ariz. Rev. Stat. Ann. S 20-731(B)(3) (1969)).

Upon the foregoing factual scenario, the Supreme Court phrased the issue as whether the "McCarran-Ferguson Act bars a federal remedy which affects a matter subject to state insurance regulation." Id. The Court reasoned that any "impairment" in the case would be indirect--the federal government sought to protect security holders while the Arizona sought to safeguard insurance policy holders. Id. at 463.

Moreover, the Court noted that there was no true "conflict" in remedies at all because "Arizona has not commanded something which the Federal Government seeks to prohibit." Id. at 463. The Court also found that the paramount federal interest in prohibiting securities fraud was perfectly compatible with the state interest in protecting policyholders. Thus, because of the nature of the indirect impairment, and because "the remedy the Commission seeks does not affect a matter predominantly of concern to policyholders alone," the Court held that it saw no reason to emasculate securities laws through an application of the McCarran-Ferguson Act. In the end, the Supreme Court "simply [could] not see the conflict" and allowed the federal government to unwind the merger notwithstanding Arizona's explicit approval. Id.

We too cannot see the conflict in this case andfind no invalidation, impairment, or supersedence, however defined, of Pennsylvania insurance law. The federal policies embodied in RICO, namely, the grant of a liberal federal

16

remedy to those who have been victimized by organized crime, see Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 487 (1985), are in no way inconsistent with the stated purpose of the UIPA, which is to "regulate trade practices in the business of insurance . . . by defining . . . such practices . . . which constitute unfair methods of competition or unfair or deceptive acts . . . ." 40 Pa. Cons. Stat. Ann. S 1171.2; see also D'Ambrosio v. Pennsylvania Nat. Mut. Cas. Ins. Co., 494 Pa. 501, 508, 431 A.2d 966, 970 (1981) (stating that the UIPA serves to deter bad faith conduct in the insurance business). Borrowing from the Supreme Court's analysis in National Securities, the RICO remedy does not exclusively affect matters predominantly of concern to those protected only by the UIPA. 393 U.S. at 463. RICO, whether in effect or purpose, is not an attempt to regulate the "sphere reserved primarily to the States by the McCarran-Ferguson Act." Id.

Of course, this court would be remiss not to recognize MetLife's argument that an application of RICO may affect, in a more abstract sense, Pennsylvania's overall implementation of insurance norms and its decision to enforce certain insurance violations in an administrative context. As acknowledged by the Court of Appeals for the Seventh Circuit:

> Undoubtedly there is a sense in which any overlap between state and federal law upsets a balance struck by one of the two legislatures. . . . Laws enforced only be administrative agencies with limited budgets are less potent than laws enforced by both agencies and private litigants. One could say that a federal rule increasing the probability that a state norm will be vindicated (or augmenting the damages assessed in the event of a violation) conflicts with a decision by the state that remedies should be limited or rare.

American Family, 978 F.2d at 295 (citations omitted). While such an argument may be compelling, there is no place for it in the present context. We find no indication, through legislative intent or judicial interpretation, that Pennsylvania's non-recognition of a private remedy under the UIPA represents a reasoned state policy of exclusive administrative enforcement or that the vindication of UIPA

17

norms should be limited or rare. Private actions for fraud and deceit in the insurance business coexist with the UIPA even though the same conduct may be covered by both the common law and the UIPA. See, e.g., 40 Pa. Cons. Stat. Ann. SS 1171.5(1) to 1171.5(3) (generally prohibiting "false", "misleading" or misrepresentative statements and omissions). In addition, Pennsylvania courts have held that the state's general consumer protection statute, 73 Pa. Cons. Stat. Ann. SS 201-1 to 201-9.2, provides a private remedy and treble damages for victims of insurance fraud. See Peckular, 355 Pa. Super. at 285-90, 512 A.2d at 430-41. This certainly undercuts any purported balance struck by the Pennsylvania legislature favoring administrative enforcement to the exclusion of private damages actions and we see no reason why a federal private right of action cannot coexist with the UIPA in these circumstances.

We therefore conclude that a RICO cause of action and remedy would not "invalidate, impair, or supersede" Pennsylvania's scheme of insurance regulation in this context. Because we need not reach the issue here, we will leave for another day the question of whether different federal and state remedies could ever be the basis for preclusion under the Act. Accordingly, the district court's dismissal of the plaintiff 's RICO claims for failure to state a claim will be reversed to the extent it relied on the McCarran-Ferguson Act as a basis for preclusion. We will also reverse the district court's denial of the motion to amend the complaint since the amendment would no longer be futile under our application of the McCarran-Ferguson Act. In so doing, however, we express no opinion as to whether the plaintiff has stated proper claims under RICO law itself.

III. The Defamation Claim

The plaintiff 's complaint also included a defamation claim against MetLife alone based on Pennsylvania law. In due course, MetLife filed a motion for summary judgment on such a claim which was granted. We will review plaintiff 's appeal of this order under a summary judgment standard. The district court's grant of summary judgement

will be affirmed if, after a plenary review of the record, there is no genuine issue of material fact. Fed. R. Civ. P. 56(c). This court will not weigh the evidence in the record itself, but instead determine whether there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 447 U.S. 242, 247 (1986); Petruzzi's IGA v. Darling-Delaware, 998 F.2d 1224, 1230 (3d Cir. 1993). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 248.

Plaintiff's defamation claim arises out of the following circumstances as set forth in the affidavit of Fred Newstrom ("Newstrom"), a sales agent for MetLife who worked with plaintiff at one time. The affidavit is based on personal knowledge, as required by Fed. R. Civ. P. 56(e).

About August 23, 1993, MetLife convened a meeting of its sales agents in the Pittsburgh region. Several hundred agents were in attendance, including Newstrom. There were various speakers, including Gary Antonino ("Antonino"), Pittsburgh Regional Manager, and Robert Crimmons, MetLife Executive Vice President for Personal Insurance. Other senior managers of MetLife were also on the dais.

During the course of an address given to the agents by Antonino, a brief clip from the movie Ghostbusters was shown. In the clip, an animated ghost figure known to those familiar with the movie as "slimer" charges down a long hallway and attacks one of the other characters. "Slimer" is a short, fat, malformed green ghost who attacks his victims by covering them with a slimy or gooey material.

Immediately following the showing of the movie clip, Antonino made statements to the audience about the way the media were portraying MetLife.

The affidavit then goes on:

> At or about the time of this meeting at the Royce Hotel, MetLife was the subject of an ongoing investigative report on the Channel 11 news, in which statements were made that MetLife was under investigation by the Pennsylvania Insurance Department for illegal deceptive sales and trade practices.

19

> Also during this time period, Antonino was letting it be known through the region that he "had it in" for Sabo, and that Sabo was at fault for all of MetLife's difficulties.
>
> Based upon the showing of the movie clip and the statements made by Antonino immediately thereafter, Herrmann understood Antonino to be saying that it was Sabo [plaintiff] who was spreading false information to the media, and that Sabo was attempting to wrongfully bring about the demise of MetLife.

App. at 487 (alteration in original). After the meeting, other MetLife agents who attended the meeting informed Newstrom that they also believed that Antonino's message was that Sabo was responsible for the information about MetLife in the media. Id.

In addition to the affidavit of Newstrom, an affidavit by agent Ronald Herrmann was filed. It also was based on personal knowledge. In it he recited that he also attended the meeting and that he also understood Sabo to be Slimer and the evil presence at MetLife. However, Herrmann did not state that Antonino "had it in" for the plaintiff.

A copy of the Report and Recommendation of the Magistrate Judge who heard the matter recommended to the district court that summary judgment be granted to MetLife on the defamation claim based solely on the ground that there was no support in the record for a finding that plaintiff was the intended target of any comments made during the "Ghostbuster" presentation. Thereafter, the district court granted MetLife's motion for summary judgment on the defamation claim solely on the ground recommended by the Magistrate Judge.

We note at the outset of this appeal that in an action for defamation under Pennsylvania law, the plaintiff has the burden of proving: (1) the defamatory character of the communications; (2) its publication by the defenda nt; (3) its application to the plaintiff; (4) the u nderstanding by the recipient of its defamatory meaning; (5) under standing by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plain tiff from its

20

publication; and (7) abuse of a conditionally priv ileged occasion. 42 Pa. Cons. Stat. Ann. S 8343(a).

We analyze the record keeping in mind that we are reviewing summary judgment and that the sole basis for granting the motion in the district court was the absence of evidence to meet this fifth requirement of the Pennsylvania statute, viz., understanding by the recipients of it that it was intended to be applied to plaintiff.

Plaintiff concedes that the alleged defamatory matter, standing on its own, is insufficient to support a jury finding that it refers to him. However, he argues that the defamation analysis must nevertheless proceed as to the fifth element if the defamatory statements may point to the defamed through "description or circumstances tending to identify him." Cosgrove Studio & Camera Shop, Inc. v. Pane, 408 Pa. 314, 319, 182 A.2d 751, 753 (1962). We turn to that contention.

Taking the recited contents of the affidavits as true, we think it reasonable to infer at this point that the affiants were aware at the time of the meeting of rumors with respect to MetLife's controversy with the plaintiff. When this circumstance is combined with the contents of the movie clip and Antonino's remarks thereafter, a genuine issue of material fact was created with respect to the fifth requirement of the Pennsylvania statute. Consequently, the resolution of that factual issue was for the finder of fact. Thus, summary judgment should not have been granted based on a failure to meet this requirement.

But our conclusion that the district court erred in its ruling on the foregoing issue does not end the matter. We cannot tell from the record whether MetLife asserted grounds other than a failure to meet the fifth element of the Pennsylvania statute in support of its summary judgment motion. Thus, we conclude that our reversal of the order granting summary judgment must be without prejudice to the district court's right to consider other asserted grounds for summary judgment, if any, that are still before it.

IV. Conclusion

The order of the district court dismissing plaintiff 's RICO claim will be reversed, and the order denying plaintiff 's

21

motion to amend the complaint will be vacated. The order
of the district court granting MetLife's motion for summary
judgment on plaintiff's defamation claim will be reversed to
the extent it was based on the ground relied on by the
district court. It is further ordered that this ruling is
without prejudice to a consideration by the district court of
other asserted grounds, if any, for summary judgment.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

22