144 F.3d 1037
 Kimberly AUTRY, on behalf of herself and all others
similarly situated, Plaintiff-Appellant,
v.
NORTHWEST PREMIUM SERVICES, INC., Northwest Insurance
Network, Inc., and Martin Joseph, Defendants-Appellees.
 No. 97-3035.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 12, 1998.
Decided May 13, 1998.*
 
 Daniel A. Edelman (argued), Edelman & Combs, Chicago, IL, for Plaintiff-Appellant.
 Cary S. Fleischer (argued), Chuhak & Tecson, Chicago, IL, for Defendants-Appellees.
 Before BAUER, COFFEY, and KANNE, Circuit Judges.
 KANNE, Circuit Judge.
 
 
 1
 In April 1997, Kimberly Autry filed a class action complaint in the United States District Court for the Northern District of Illinois. Count I of her complaint alleged that the disclosures contained in her Premium Financing Agreement ("Agreement") violated the Truth In Lending Act ("TILA"), 15 U.S.C. § 1601 et seq. Autry also alleged that the disclosures violated the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA"), 815 Ill. Comp. Stat. 505/1 et seq. The district court granted the defendants' motion to dismiss Count I of the complaint on the ground that the McCarran-Ferguson Act ("McCarran Act"), 15 U.S.C. § 1012(b), barred application of TILA to the Agreement. The district court then declined to exercise its supplemental jurisdiction authority over Autry's state law claims. Because we find that the McCarran Act does not bar application of TILA to the Agreement, we reverse the dismissal of Autry's complaint and remand for further proceedings consistent with this opinion.
 
 I. HISTORY
 
 2
 In June 1996, Autry financed the purchase of an insurance policy on her automobile by signing a Premium Finance Agreement and Disclosure Statement. Autry claims that the disclosures in the Agreement misstate the amount financed, the finance charge, and the total amount of payments in violation of TILA and the Illinois CFA. Autry sued both Northwest Premium Services, Inc. and Northwest Insurance Network, Inc. because she contends that the Agreement refers to both parties and the identity of the party that actually extended the credit is unclear.
 
 
 3
 The defendants filed a motion to dismiss in June 1997, asking that the district court dismiss the TILA count as barred by the McCarran Act. The district court granted defendants' motion, finding that under our precedent in Lowe v. Aarco-American, Inc., 536 F.2d 1160, 1162 (7th Cir.1976),[1] the financing of insurance premiums was part of the "business of insurance" under the McCarran Act, that application of TILA would impede Illinois law, and therefore premium financing activities were beyond the reach of TILA and instead governed solely by state law. The district court dismissed Autry's TILA claim with prejudice and dismissed her state law claims without prejudice.
 
 
 4
 On appeal, Autry asks us to reevaluate whether premium financing is part of the "business of insurance." Autry argues that several Supreme Court cases decided after Lowe suggest that Lowe was incorrectly decided and we should now overrule it. In addition, Autry notes the circuit split on the issue between our Circuit and the Fifth as a reason to reconsider Lowe. In the alternative, Autry argues that even if premium financing is the "business of insurance," TILA does not impair, invalidate, or supersede the Illinois law on premium financing agreements, and therefore TILA may still be applied.
 
 
 5
 The defendants respond that Lowe was correctly decided and that the intervening Supreme Court cases only serve to reinforce Lowe. They urge us to renew our holding in Lowe that premium financing constitutes the "business of insurance." Defendants also argue that application of TILA would impede the state law in the area, and thus TILA may not be applied. They ask that we find that the McCarran Act bars Autry's TILA claim.[2]
 
 II. ANALYSIS
 A. Standard of Review
 
 6
 A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted. See Fed.R.Civ.P. 12(b)(6). Whether a district court correctly dismissed a complaint is a question of law that we review de novo. See Moss v. HealthCare Compare Corp., 75 F.3d 276, 279 (7th Cir.1996). In reviewing a motion to dismiss, we review all facts alleged in the complaint and any inferences reasonably drawn therefrom in the light most favorable to the plaintiff. See Caldwell v. City of Elwood, 959 F.2d 670, 671 (7th Cir.1992). Dismissal is warranted only if the plaintiff can prove no set of facts in support of her claims that would entitle her to relief. See Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).
 
 B. The McCarran-Ferguson Act
 1. History
 
 7
 Congress enacted the McCarran Act in response to the Supreme Court's decision in United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944). See United States Dept. of the Treasury v. Fabe, 508 U.S. 491, 499, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993). Prior to South-Eastern Underwriters, courts had determined that issuing an insurance policy was not a transaction in commerce and therefore not subject to federal regulation. See id. (citing Paul v. Virginia, 75 U.S. (8 Wall.) 168, 183, 19 L.Ed. 357 (1868)). Thus " 'States enjoyed a virtually exclusive domain over the insurance industry.' " Id. (quoting St. Paul Fire & Marine Ins. Co. v. Barry, 438 U.S. 531, 539, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978)).
 
 
 8
 This situation was soon to change. In light of "[t]he emergence of an interconnected and interdependent national economy," id., courts expanded their conception of interstate commerce. This expanded conception led the Supreme Court to hold that an insurance company that conducted business across state lines was engaged in interstate commerce and thus subject to federal antitrust laws. See South-Eastern Underwriters, 322 U.S. at 533, 64 S.Ct. 1162. This development caused states to be concerned about their power to tax and regulate the insurance industry. See Fabe, 508 U.S. at 499, 113 S.Ct. 2202. Specifically, SouthEastern Underwriters "threatened the continued supremacy of the States," SEC v. National Sec., Inc., 393 U.S. 453, 459, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), "in regulating the dealings between insurers and their policy holders," id. Congress responded by passing the McCarran Act.
 
 
 9
 Congress expressed the purpose of the McCarran Act in its first section:
 
 
 10
 Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.
 
 
 11
 15 U.S.C. § 1011. As this section demonstrates, Congress intended the McCarran Act to allow the states to regulate the business of insurance "free from inadvertent preemption by federal statutes of general applicability." Merchants Home Delivery Serv., Inc. v. Frank B. Hall & Co., 50 F.3d 1486, 1488-89 (9th Cir.1995). To this end, Congress reversed the standard rules for preemption, creating a "clear-statement rule ... that state laws enacted 'for the purpose of regulating the business of insurance' do not yield to conflicting federal statutes unless a federal statute specifically requires otherwise." Fabe, 508 U.S. at 507, 113 S.Ct. 2202.
 
 2. The Language of the McCarran Act
 
 12
 " '[T]he starting point in a case involving construction of the McCarran-Ferguson Act, like the starting point in any case involving the meaning of a statute, is the language of the statute itself.' " Fabe, 508 U.S. at 500, 113 S.Ct. 2202 (quoting Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 210, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979)). The specific statutory provision at issue in this case is § 2(b) of the Act, which provides as follows:
 
 
 13
 No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: Provided, That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State Law.
 
 
 14
 15 U.S.C. § 1012(b).
 
 
 15
 Section 2(b) contains two clauses, separated by the colon. The first clause may be broken down into two phrases: The first establishes that state law "enacted ... for the purpose of regulating the business of insurance" preempts federal law of general applicability to the extent the federal law invalidates, impairs, or supersedes the state law. The second phrase creates an exception to this preemption--if the federal law specifically relates to the business of insurance, the federal law may be applied even if it would invalidate, impair, or supersede a state law. The second clause, known as the "antitrust exemption," provides that federal antitrust law will control the business of insurance unless that business is regulated by state law. The Supreme Court recently elaborated on the purposes behind the clauses:
 
 
 16
 [T]he first clause of § 2(b) was intended to further Congress' primary objective of granting the States broad regulatory authority over the business of insurance. The second clause accomplishes Congress' secondary goal, which was to carve out only a narrow exemption for "the business of insurance" from the federal antitrust laws.
 
 
 17
 Fabe, 508 U.S. at 505, 113 S.Ct. 2202.
 
 
 18
 C. The Appropriate Inquiry for Cases Involving the First
 
 Clause of the McCarran Act
 
 19
 This case turns on the application of the first clause of § 2(b). The question before us is whether the first clause of the McCarran Act precludes application of TILA to premium financing agreements when Illinois has enacted a law regulating such agreements. This question requires three inquiries: first, does the federal statute at issue "specifically relate to the business of insurance;" second, was the state statute "enacted ... for the purpose of regulating the business of insurance"; and third, would application of the federal statute "invalidate, impair or supersede" the state law. See id. at 501, 113 S.Ct. 2202; see also Ambrose v. Blue Cross & Blue Shield, 891 F.Supp. 1153, 1158 (E.D.Va.1995), aff'd, 95 F.3d 41 (4th Cir.1996).
 
 
 20
 While we find this three part inquiry is the appropriate test for questions involving the first clause of § 2(b), we note that many courts utilize a four part test. See, e.g., Sabo v. Metropolitan Life Ins. Co., 137 F.3d 185 (3d Cir.1998); Merchants Home Delivery Serv., 50 F.3d at 1489. The four part test runs as follows:
 
 
 21
 The McCarran-Ferguson Act precludes the application of a federal statute if: (1) the statute does not "specifically relate" to the business of insurance, (2) the acts challenged under the statute constitute the business of insurance, (3) the state has enacted a law or laws regulating the challenged acts, and (4) the state law would be superseded, impaired or invalidated by the application of the federal statute.
 
 
 22
 Merchants Home Delivery Serv., 50 F.3d at 1489 (citing Cochran v. Paco, Inc., 606 F.2d 460, 464 (5th Cir.1979)). The first and last parts of this test are identical to the first and last parts of the three part test. The difference lies in parts two and three. While the three part test asks "was the state statute enacted for the purpose of regulating the business of insurance," the four part test breaks this down into two questions: (a) is the action at issue part of the business of insurance, and (b) has the state enacted a law to regulate this action?
 
 
 23
 We decline to use the four part test for two reasons: First, the Court in Fabe, while not explicitly setting forth a three part test, stated:
 
 
 24
 The parties agree that application of the federal priority statute would "invalidate, impair, or supersede" the Ohio priority scheme and that the federal priority statute does not "specifically relat[e] to the business of insurance." All that is left for us to determine, therefore, is whether the Ohio priority statute is a law enacted "for the purpose of regulating the business of insurance."
 
 
 25
 Fabe, 508 U.S. at 501, 113 S.Ct. 2202. This language leads us to believe that the Supreme Court conceptualized the inquiry as involving those three questions. Second, the four part test misplaces the emphasis of the inquiry. The four part test requires the court to examine the activity at issue to determine whether the activity being regulated is part of the "business of insurance." However, the statutory language counsels us to examine the purpose for which the statute was enacted to determine whether the statute is one "enacted ... for the purpose of regulating the business of insurance." While this distinction may seem somewhat semantic, the effect is far from inconsequential.
 
 
 26
 To understand fully the impact of analyzing the activity regulated instead of the purpose of the regulation itself, we must examine how courts have been determining whether the activity is part of "the business of insurance." The Supreme Court has twice defined the term "business of insurance" in the context of the second clause, or "antitrust exemption," of the McCarran Act. See Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982); Royal Drug, 440 U.S. at 210, 99 S.Ct. 1067. In Pireno, the Court stated the test as follows:
 
 
 27
 [T]hree criteria [are] relevant in determining whether a particular practice is part of the "business of insurance" exempted from the antitrust laws by § 2(b): first, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry.
 
 
 28
 Pireno, 458 U.S. at 129, 102 S.Ct. 3002. Courts using the four part test borrow this definition and apply it to the "activity" under scrutiny to determine whether the activity is part of "the business of insurance." See, e.g., Sabo, 137 F.3d at 188; Merchants Home Delivery Serv., 50 F.3d at 1490.
 
 
 29
 The problem with this approach is that it casts too small a net to capture all of the statutes that were "enacted ... for the purpose of regulating the business of insurance." There will be cases where the regulated activity does not constitute the "business of insurance" as that term is defined in Pireno, yet the statute that regulates the activity may have been enacted "for the purpose of regulating the business of insurance." As the Fabe Court stated, the "broad category of laws enacted 'for the purpose of regulating the business of insurance' ... necessarily encompasses more than just the 'business of insurance.' " Fabe, 508 U.S. at 505, 113 S.Ct. 2202.
 
 
 30
 Take, for example, the statute at issue in Fabe. The state statute at issue regulated creditor priority in a bankruptcy dissolution and gave policyholders a higher preference than they received under the federal statute. If we asked only whether the activity in question, bankruptcy dissolution, was the "business of insurance" as defined in Pireno, the answer would be "no." If the activity in question is not the "business of insurance," it would follow from the four part test that the statute enacted to regulate it cannot be a statute "enacted ... for the purpose of regulating the business of insurance." Yet, as the Supreme Court noted, the preferencing of policyholders "serves to ensure that, if possible, policyholders ultimately will receive payment on their claims." Id. at 506, 113 S.Ct. 2202. "Because the [state] statute is 'aimed at protecting or regulating' the performance of an insurance contract ... it follows that it is a law 'enacted for the purpose of regulating the business of insurance' within the meaning of the first clause of § 2(b)." Id. at 505, 113 S.Ct. 2202 (citation omitted). In sum, courts applying the four part test may have concluded that the McCarran Act did not preclude application of the federal statute, while the Supreme Court, applying what we believe to be a three part test, reached the opposite conclusion.
 
 
 31
 The Supreme Court did not simply look to the activity being regulated to determine whether it qualified as the "business of insurance." Instead, it dissected the statute and looked to an ultimate effect of the statute: increased probability of enforcement of the insurance contract. Id. at 502-05, 113 S.Ct. 2202. Thus, a statute that regulates bankruptcy proceedings may still be a statute "enacted ... for the purpose of regulating the business of insurance" even though bankruptcy proceedings themselves are not the "business of insurance." The Supreme Court's approach reinforces our belief that the four part test misplaces the emphasis by examining the activity regulated by the statute instead of the purpose of the statute.
 
 
 32
 We conclude that the appropriate test to employ is the three part test. Accord Ambrose, 891 F.Supp. at 1161 & n. 5. The three part test requires the following three inquiries: (1) Does the federal statute at issue "specifically relate to the business of insurance"? If so, the standard preemption rules apply and the federal statute is applied. If the federal statute does not "specifically relate to the business of insurance," a court must ask (2) whether the state statute was "enacted ... for the purpose of regulating the business of insurance." If the state law was not enacted for this purpose, then the court's inquiry ends. If, however, the state statute was so enacted, a court must proceed to determine (3) whether application of the federal statute would "invalidate, impair or supersede" the state law. If the federal statute would have one of these effects, then it may not be applied in the face of the state law. On the other hand, if the federal statute would not "invalidate, impair, or supersede" state law, then the federal statute may be applied.[3]
 
 
 33
 Neither party in this action suggests that TILA specifically relates to the business of insurance. We therefore proceed to whether the Illinois statute was "enacted ... for the purpose of regulating the business of insurance." If it was so enacted, we proceed to the third inquiry. If, however, the state statute was not "enacted ... for the purpose of regulating the business of insurance," then the state statute is outside of the McCarran Act's protective umbrella and our inquiry ends.
 
 
 34
 D. Determining Whether 215 Ill. Comp. Stat. 5/513a9
 
 Is a Statute Enacted for the Purpose of
 Regulating the Business of Insurance
 
 35
 Section 513a9 of the Illinois Compiled Statutes provides as follows:
 
 
 36
 § 513a9. Premium finance agreement.
 
 
 37
 (a) A premium finance agreement must be dated and signed by or on behalf of the named insured, and the printed portion shall be in at least 8-point type. The following items must be set forth on the first page of the accepted finance agreement:
 
 
 38
 (1) the total amount of the premiums;
 
 
 39
 (2) the amount of the down payment;
 
 
 40
 (3) the principal balance (the difference between items (1) and (2));
 
 
 41
 (4) the amount of the finance charges expressed in dollars and as an annual percentage rate;
 
 
 42
 (5) the balance payable by the insured (sum of items (3) and (4));
 
 
 43
 (6) the number of installments, the due dates thereof, and the amount of each installment expressed in dollars; and
 
 
 44
 (7) the policy numbers or binder numbers.
 
 
 45
 (b) The premium finance company is required to furnish full and complete disclosure of the terms and conditions of the premium finance agreement including, but not limited to, the specific insurance coverages financed to the named insured no later than the date that the first premium payment notice is sent to the insured.
 
 
 46
 (c) As to policies written primarily for personal, family, or household use, the premium finance company must:
 
 
 47
 (1) deliver or mail the premium check or checks in the amount of the principal balance directly to the insurer or insurers unless the insurer or insurers have given written authority to the premium finance company to deliver the checks to the producer;
 
 
 48
 (2) issue the premium check or checks payable to the insurer, insurers, or, if the insurer gives written authority to the premium finance company, to the producer; and
 
 
 49
 (3) properly identify the premium check or checks by policy number or binder number when the premium is paid to the insurer or insurers.
 
 
 50
 (d) As to all other policies the premium finance company may:
 
 
 51
 (1) deliver or mail the premium check or checks in the amount of the principal balance directly to the producer; and
 
 
 52
 (2) issue the premium check or checks payable to the producer.
 
 215 Ill. Comp. Stat. 5/513a9.[4]
 
 53
 Although we have settled the question of whether we should use a four part test and look at the activity regulated or employ a three part test and look to the purpose of the statute itself, we must still resolve how to determine whether the statute at issue is one "enacted ... for the purpose of regulating the business of insurance." The Court has addressed this question twice in its history, the first time in National Securities and the second time in Fabe.
 
 
 54
 The Supreme Court in National Securities concluded that a law "enacted ... for the purpose of regulating the business of insurance" is one "aimed at protecting or regulating [the] relationship [between insurer and insured], directly or indirectly." National Sec., 393 U.S. at 460, 89 S.Ct. 564. The Court elaborated:
 
 
 55
 Congress was concerned with the type of state regulation that centers around the contract of insurance, the transaction which Paul v. Virginia held was not "commerce." The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation and enforcement--these were the core of the "business of insurance." Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they to [sic] must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was--it was on the relationship between the insurance company and the policyholder.
 
 
 56
 Id. In Fabe, the Court stated, "[t]he broad category of laws 'enacted for the purpose of regulating the business of insurance' consists of laws that possess the 'end, intention, or aim' of adjusting, managing, or controlling the business of insurance." Fabe, 508 U.S. at 505, 113 S.Ct. 2202. Putting the Fabe and National Securities formulations together, a statute is "enacted ... for the purpose of regulating the business of insurance" if it possesses the end, intention, or aim of adjusting, managing, or controlling the relationship between the insurance company and the policyholder, directly or indirectly.[5]
 
 
 57
 Under this formulation, we hold that 215 Ill. Comp. Stat. 5/513a9 is not a statute "enacted ... for the purpose of regulating the business of insurance." The Illinois law addresses the relationship between a creditor and a debtor, not the relationship between an insurance company and a policyholder. Although sections (a) and (b) of the statute regulate disclosure in the financing of insurance premiums, and subsections (c) and (d) regulate to whom the finance company must deliver the premium check, the critical point is that the state is attempting to protect the interests of the borrower qua borrower. The statute may serve to protect someone who happens to be an "insured," but it does not protect that person in his capacity as a party to a contract of insurance. The fact that the money borrowed ultimately pays insurance premiums is incidental. The statute in question simply regulates the lending activities of companies involved in premium finance.
 
 
 58
 Our analysis is the same even if it is the insurance company doing the financing. The financing agreement is a contractual arrangement separate from the insurance policy itself, and the insurance company acts not as an insurance company but as a creditor under that contract. The financing activity is ancillary to the insurance relationship. Thus, the Illinois statute, which regulates the debtor-creditor relationship under premium financing agreements, does not possess an end, intention, or aim of directing, managing, or controlling the relationship between the insurance company and the policyholder. As such it is not a law "enacted ... for the purpose of regulating the business of insurance" and therefore it is outside the scope of the McCarran Act. Because the Illinois statute is outside of the McCarran Act's protective umbrella, it does not preempt federal law, and the court may apply TILA.
 
 
 59
 E. Lowe v. Aarco-American, Inc.
 
 
 60
 In Lowe we summarily determined that the credit sale of insurance policies by an insurance broker and a premium finance company was part of the "business of insurance" and therefore exempt from TILA's application. See 536 F.2d at 1162. The Fifth Circuit, in Perry v. Fidelity Union Life Ins. Co., 606 F.2d 468, 470 (5th Cir.1979) and Cochran, 606 F.2d at 460, disagreed with our holding and created a circuit split.
 
 
 61
 In Lowe, we asked whether the activity of premium financing was part of the "business of insurance." As argued supra, given intervening Supreme Court decisions and particularly the recent Fabe opinion, we believe that the appropriate inquiry is whether the statute at issue is one "enacted ... for the purpose of regulating the business of insurance," not whether the activity the statute regulates may properly be considered the "business of insurance." This approach, in addition to being consistent with the language of the statute, has the added benefit of addressing state law statute by statute to determine whether it trumps federal law. Under the Lowe approach, any state statute regulating any aspect of premium financing would be immune from federal preemption because premium financing is "the business of insurance."
 
 
 62
 We hold that a statute enacted to regulate disclosure and delivery requirements in premium financing agreements is not the kind of statute rightfully protected from federal preemption under the McCarran Act. To the extent that our approach to this question and our holding departs from our prior decision in Lowe, we overrule our decision in Lowe.
 
 
 63
 For the forgoing reasons, we REVERSE the district court's dismissal of Autry's TILA and state law claims and REMAND for proceedings consistent with this opinion.
 
 
 
 *
 This opinion has been circulated among all judges of this court pursuant to Circuit Rule 40(e). No judge favored a rehearing en banc
 
 
 [1]
 Lowe was overturned on other grounds by NAACP v. American Family Mut. Ins. Co., 978 F.2d 287, 297 (7th Cir.1992). The district court determined that the American Family decision left Lowe 's holding that premium financing involved the "business of insurance" untouched
 
 
 [2]
 This description reflects how the parties have framed the issue for review. We conceptualize the inquiry differently. See infra
 
 
 [3]
 We recognize that our formulation today differs from the one used in American Deposit Corp. v. Schacht, 84 F.3d 834, 838 (7th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 185, 136 L.Ed.2d 123 (1996). In Schacht we first addressed whether the state statute was "enacted ... for the purpose of regulating the business of insurance." After answering that question in the affirmative, we asked whether the particular activity at issue in the case was part of the "business of insurance." No doubt we took this second step because Fabe counsels that a statute "need not be treated as a package which stands or falls in its entirety," Fabe, 508 U.S. at 509 n. 8, 113 S.Ct. 2202, and instead that a state statute should only displace federal law "to the extent that it regulates policyholders," id. at 508, 113 S.Ct. 2202. Because we find that the Illinois statute regulating premium financing agreements is not one "enacted ... for the purpose of regulating the business of insurance," we need go no further
 
 
 [4]
 In their brief, the defendants refer to several statutes within Article XXXII of the Illinois Compiled Statutes. Article XXXII is entitled "Premium Finance Companies," and the statutes within it regulate all manner of things related to such companies. However, the only state statute at issue in this case is 215 Ill. Comp. Stat. 5/513a9, the statute relating to premium finance agreements. Specifically, the only sections at issue are subsections (a) and (b) of § 513a9. The question we must address is whether § 513a9 is a law "enacted ... for the purpose of regulating the business of insurance." Examining other state statutes, even if such statutes are located in the same section of the Illinois Compiled Statutes, would not assist our inquiry and we therefore decline to do so
 
 
 [5]
 We confess some uncertainty as to whether Fabe counsels us to employ the Pireno test in cases involving the first clause of § 2(b) to determine whether a statute is one "enacted ... for the purpose of regulating the business of insurance." Although the Court distinguished Pireno as applying to cases involving the antitrust exemption, it employed a Pireno analysis in its discussion. Many other courts have struggled with the same question. See, e.g., Ambrose, 891 F.Supp. at 1160. We do not understand Fabe to require the Pireno analysis in this situation. We read the Fabe Court's Pireno analysis as responding to the petitioner's argument that the appropriate question was whether the liquidation of an insolvent insurance company is part of the "business of insurance." By interpreting the statute as not merely ranking creditor priority in bankruptcy, but as affecting the actual performance of the insurance contract, the Supreme Court established that even under Pireno the statute was one "enacted ... for the purpose of regulating the business of insurance." Thus the Supreme Court defeated the petitioner's argument on its own ground. Understanding the Court's Pireno analysis in this context, we conclude that the Pireno analysis is not a necessary part of determining whether a statute is "enacted ... for the purpose of regulating the business of insurance." This understanding comports with the Fabe Court's statement that:
 Both Royal Drug and Pireno ... involved the scope of the antitrust immunity located in the second clause of § 2(b). We deal here with the first clause, which is not so narrowly circumscribed. The language of § 2(b) is unambiguous: The first clause commits laws "enacted ... for the purpose of regulating the business of insurance" to the States, while the second clause exempts only "the business of insurance" itself from the antitrust laws. To equate laws "enacted ... for the purpose of regulating the business of insurance" with the "business of insurance" itself, as petitioner urges us to do, would be to read words out of the statute. This we refuse to do.
 Fabe, 508 U.S. at 504, 113 S.Ct. 2202. Additionally, the Pireno criteria focus on the activity regulated by the statute. Since we have previously determined that our focus is not on the activity itself, the Pireno factors provide too narrow a test. Accord Ambrose, 891 F.Supp. at 1160-61 & n. 5 ("[T]o the extent that Pireno and Royal Drug consider whether the practice being regulated is itself the business of insurance, their analysis is inapplicable in a case controlled by the broader first clause of Section 2(b).").