

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-3-2007

# Weiss v. First Unum Life Ins

Precedential or Non-Precedential: Precedential

Docket No. 05-5428

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Weiss v. First Unum Life Ins" (2007). *2007 Decisions.* Paper 1176.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1176

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 05-5428

_____

RICHARD D. WEISS,
Appellant

v.

FIRST UNUM LIFE INSURANCE COMPANY,
A New York Corporation;
LUCY E. BAIRD-STODDARD;
J. HAROLD CHANDLER, as Chairman, President
and Chief Executive Office of UNUMPROVIDENT;
GEORGE J. DIDONNA, M.D.; KELLY M. SMITH;
JOHN AND JANE DOES 1-100

_____

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 02-cv-04249)
District Judge: Honorable Garrett E. Brown, Jr.

_____

Argued January 9, 2007

Before:  SLOVITER and RENDELL, <u>Circuit</u> <u>Judges</u>,
and RUFE,* <u>District</u> <u>Judge</u>.

(Filed: April 3, 2007)
―――――――

Gail M. Cookson
Avrom J. Gold     **[ARGUED]**
Mandelbaum, Salsburg, Gold,
Lazris & Discenza
155 Prospect Avenue
West Orange, NJ  07052
   *Counsel for Appellant*

Steven P. Del Mauro     **[ARGUED]**
McElroy, Deutsch, Mulvaney & Carpenter
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, NJ  07962
   *Counsel for Appellees*

―――――――

OPINION OF THE COURT
―――――――

―――――――

*Honorable Cynthia M. Rufe, District Judge for the Eastern District of Pennsylvania, sitting by designation.

RENDELL, *Circuit Judge*.

Richard Weiss brought suit under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Pub. L. 91-452, 84 Stat. 941, as amended, 18 U.S.C. §§ 1961-1968, against his insurer, First Unum Life Insurance Co. ("First Unum"), claiming that First Unum discontinued payment of his disability benefits as part of First Unum's racketeering scheme involving an intentional and illegal policy of rejecting expensive payouts to disabled insureds. The District Court dismissed his claim, believing that the allowance of such a RICO claim would interfere with New Jersey's statutory regulation of insurers, and thus run afoul of the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015. We disagree and will reverse.

## FACTUAL AND PROCEDURAL HISTORY

The facts of the underlying RICO suit are straightforward. From July 1997 to August 2001, Weiss was employed by Tucker Anthony Sutro as an investment banker. He was insured by First Unum through a group insurance policy with Tucker Anthony Sutro. The policy provided long-term disability benefits when the insured is "'limited from performing the material and substantial duties of [his] regular occupation due to . . . sickness or injury.'" *Weiss v. First Unum Life Ins. Co., et al.*, No. 02-4249, slip op. at 3 (D.N.J. Aug. 27, 2003) (quoting policy). On January 2, 2001, Weiss suffered an acute heart attack requiring an emergency angioplasty. *Id.* On June 25, 2001, he was hospitalized again due to ventricular tachycardia. Weiss continues to suffer from severe left ventricular dysfunction and extremely low blood pressure,

3

resulting in frequent lightheadedness, weakness, and shortness of breath. *Id.* After suffering the initial attack, Weiss filed a claim in May 2001 stating that he was totally disabled and seeking long-term disability benefits under the group disability plan issued by First Unum to Tucker. First Unum approved the claim and paid Weiss the maximum short-term disability benefit available under the plan from January 2, 2001 (the date of the infarction) to July 1, 2001. Weiss applied for and was paid long-term disability benefits from July 26, 2001, to October 23, 2001, at which point First Unum discontinued Weiss's benefits. The reason First Unum did so is at the heart of Weiss's federal RICO challenge.

Weiss claims the discontinuance did not result from consultation with any physician but from an illegal policy and scheme First Unum followed in order to reduce expensive payouts. After exhausting his administrative remedies, Weiss commenced litigation in New Jersey state court. Weiss initially brought only state-law claims against First Unum. First Unum then removed the case to federal court and filed a motion to dismiss, arguing that Weiss's state-law claims were preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 88 Stat. 829, as amended, 29 U.S.C. § 1001 et seq. (2000 ed. and Supp. III). While the case was in its early stages, and before Weiss added a RICO count to its suit against First Unum, First Unum resumed payment of Weiss's long-term disability benefits retroactive to October 23, 2001 (the date of

4

the initial termination).[1]

On November 26, 2002, Weiss filed claims based on violations of RICO and conspiracy to violate RICO; violation of New Jersey's state RICO Act; conspiracy to violate New Jersey's RICO Act; wrongful termination of insurance benefits; negligent and intentional infliction of emotional distress; and violation of New Jersey's Consumer Fraud Act ("CFA"), N.J. Stat. Ann. § 56:8-1-20. Specifically, Weiss alleges that his claim was targeted for termination because it exceeded $11,000 per month. He alleges that on October 3, 2001, defendants David Gilbert, Paul Keenan, George DiDonna, Lucy-Baird Stoddard, and others conspired at a roundtable meeting to

---

[1] First Unum paid interest on the amount and also paid an amount for attorneys' fees. First Unum continues to pay a monthly disability benefit to Weiss. But First Unum did not make Weiss whole with respect to fees and penalties he incurred while deprived of his long-term benefits, nor did First Unum account for the fact that Weiss sold real estate and various properties at a loss in order to obtain medical care while his benefits were being withheld. First Unum states that this repayment was due in part to representations by Weiss's counsel that Weiss was in desperate condition, and that the litigation was harming Weiss. Weiss states that before he officially added the RICO claim, he made clear to First Unum in a pre-trial joint-discovery plan that he would be adding that claim to his allegations. Accordingly, Weiss argues that the reinstatement of benefits was an attempt to "pick off" his case before it could gather momentum and seek treble damages.

terminate Weiss's benefits and devise a rationalization for doing so. Weiss claims that DiDonna did not receive or examine his hospital records until the termination decision was reached, and that tests that would make clear the severity of his injury were purposely never ordered. He avers not merely a bad-faith denial of benefits limited to his case, but rather that his denial is one instance in a pattern of fraudulent activity by First Unum aimed at depriving its insureds with large disability payouts of their contractual benefits.

The procedural history of Weiss's action is complex and we recount it only briefly, as the central issue before us does not hinge on it. The District Court initially dismissed the two state-law claims of consumer fraud and infliction of emotional distress as pre-empted by ERISA, but construed the claim for wrongful termination of insurance benefits as asserting a cause of action under ERISA. Thereafter, the District Court held that Weiss failed to allege the concrete financial loss compensable as damage to business or property required by RICO, and thus lacked standing to bring either his federal RICO claim or his New Jersey RICO claim (which required a similar harm to business or property). The Court also held that Weiss failed to plead with sufficient particularity the allegedly fraudulent activity, or differentiate between the defendants in describing their conduct. Weiss then attempted to cure these deficiencies but the District Court concluded that he had not done so and had still failed to allege the type of "concrete financial loss compensable as damage to business or property." *Weiss v. First Unum Life Insurance Co., et al.*, No. 02-4249, slip op. at 9 (D.N.J. Feb. 25, 2004). Accordingly, the District Court dismissed the RICO claims, leaving only the ERISA claim in

6

which Weiss sought a declaratory judgment that he was entitled to future benefits.

Weiss then appealed the orders of the District Court and on June 9, 2005, a panel of our Court heard oral argument. Although he had not raised the point in his brief (and it was only mentioned in Weiss's reply brief), counsel for First Unum urged that the McCarran-Ferguson Act "reverse pre-empts" federal civil RICO claims brought by claimants in states where "regulation of insurance in that state does not permit a private cause of action." Appellant's Appx. 16, Tr. 27. Upon inquiry as to why the issue had not been raised below, counsel replied that it "was just not an issue that was appreciated." *Id.* Counsel then suggested "a remand back to Judge Brown to develop a record for Your Honors on this particular issue," Appellant's Appx. 17, Tr. 32, and counsel for Weiss in her rebuttal stated that she was not opposed to a remand. On June 14, 2005, the panel issued a "Judgment Order" remanding for a "determination of what effect the McCarran-Ferguson Act, specifically section 1012(b) of Title 15 of the United States Code, may have on the disposition of this case." *Weiss v. First Unum Life Ins. Co.*, No. 04-2021 (3d Cir. June 4, 2005).[2]

---

[2]The order also stated that the "August 27, 2003, Order of the District Court dismissing Appellant's First Amended Complaint is VACATED," and that the "February 13, 2004, Order of the District Court denying Appellant leave to file a Second-Amended Complaint is VACATED except with regard to Appellant's ERISA amendment." *Weiss v. First Unum Life Ins. Co.*, No. 04-2021 (3d Cir. June 4, 2005). Although we need

On remand, the District Court dismissed Weiss's First Amended Complaint,[3] holding that the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, precluded its applicability given New Jersey's Insurance Trade Practices Act ("ITPA"), N.J. Stat. Ann. §§ 17:29B-1-19, because allowing RICO claims would "impair" New Jersey's regulatory scheme.[4] *Weiss v. First Unum Life Ins.*

---

not concern ourselves with the import of these aspects of the previous order, we will do so only to comment on a jurisdictional matter, namely, whether Weiss had alleged a loss of a type that satisfies RICO standing. We believe that our order vacating the previous decision of the District Court recognized that the losses alleged by Weiss (as a result of his having had to sell his home and personal property below the property's fair market value as well as having incurred fees and penalties from the IRS) were out-of-pocket expenses fairly traceable to First Unum's conduct, and thus qualify as an injury to property for RICO purposes. *See Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000) (injury to business or property exists where the plaintiff suffered "concrete financial loss" such that "actual monetary loss, i.e., an out-of-pocket loss" occurred).

[3]Weiss in his instant appeal includes allegations from his Second Amended Complaint which First Unum claims should not be heard, given the District Court's reliance on the First Amended Complaint. In light of our disposition of this case, we need not resolve this issue.

[4]We note that § 17:29B-1 et seq. is not expressly entitled the "Insurance Trade Practices Act," and that there is a similar trade

8

*Co.*, 416 F. Supp. 2d 298, 301 (D.N.J. 2005) (quoting 15 U.S.C. § 1102(b)).  Weiss timely appealed.

## DISCUSSION

In order to determine whether the District Court was correct, we must first explicate the purpose and contours of the McCarran-Ferguson Act.  The McCarran-Ferguson Act, was enacted in 1945 in response to the decision in *United States v. South-Eastern Underwriters Association*, 322 U.S. 533 (1944), which held that Congress could regulate the business of insurance with its Commerce Clause authority.  Section 1 of the Act, codified at 15 U.S.C. § 1011, expressed Congress's "Declaration of Policy."

---

practices regulatory act specifically regulating the life insurance, health insurance, and annuities businesses.  *See* N.J. Stat. Ann. § § 17B:30-1-22.  The existence of this additional provision in the New Jersey code, and the lack of clarity as to the names of both acts, has been the source of some confusion in the case law. *See, e.g.*, *Yourman v. People's Sec. Life Ins. Co.*, 992 F. Supp. 696, 700-01 (D.N.J. 1998); *Pierzga v. Ohio Cas. Group of Ins. Cos.*, 504 A.2d 1200, 1204 (N.J. Super. Ct. App. Div. 1986).  As the New Jersey Supreme Court refers to § 17:29B-1 et seq. as "ITPA" in its recent decisions, *see, e.g., R.J. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Ins. Co.*, 773 A.2d 1132, 1145-46 (N.J. 2001); *Lemelledo v. Benefit Mgmt. Corp.*, 696 A.2d 546, 554 (N.J. 1997), we use that convention herein.

The Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.

15 U.S.C. § 1011.

Section 2 of the Act, codified at 15 U.S.C. § 1012, set forth Congress's attempt to explain the federal-state balance that was intended:

(a) State regulation. The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

(b) Federal regulation. No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: Provided, That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be

10

applicable to the business of insurance to the extent that such business is not regulated by State law.

15 U.S.C. § 1012.

Thereafter, in *Prudential Insurance Co. v. Benjamin*, 328 U.S. 408 (1946), the Supreme Court explained the legislative intent behind the statute. It wrote that Congress's purpose

was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance. This was done in two ways. One was by removing obstructions which might be thought to flow from its own power, whether dormant or exercised, except as otherwise provided in the Act itself or in future legislation. The other was by declaring expressly and affirmatively that continued state regulation and taxation of this business is in the public interest and that the business and all who engage in it "shall be subject to" the laws of the several states in these respects.

*Id.* at 429-30.

Years later in the comprehensive opinion in *Sabo v. Metropolitan Life Insurance Co.*, 137 F.3d 185 (3d Cir. 1998), a case involving the relationship between RICO and Pennsylvania's Unfair Insurance Practices Act ("UIPA"), 40 Pa. Cons. Stat. Ann. §§ 1171.1-.15 (1999), we canvassed the

11

different features of the Act and parsed the terms of Section 2(b), including what constituted the "business of insurance." There, as here, the case turned on the initial portion of Section 2(b)–"No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . ."–as RICO clearly is not a law "specifically relating to the business of insurance." In *Sabo* we noted that the "phrase 'invalidate, impair, or supersede' is not defined anywhere in the Act," and we were thus "faced with the considerable task of grappling with its construction." *Sabo*, 137 F.3d at 193. We reasoned that "invalidate, impair, or supersede" included both the situation where federal law was in "direct conflict" with the state scheme, and the situation where federal law would frustrate state policy. *See Sabo*, 137 F.3d at 194 ("The federal policies embodied in RICO, namely, the grant of a liberal federal remedy to those who have been victimized by organized crime, are in no way inconsistent with the stated purpose of the UIPA . . . .") (citation omitted). However, the absence of direct conflict or frustration did not end the inquiry; a violation of Section 2(b) could also be shown through intentionally divergent policies or evidence of a desire for exclusive administrative enforcement. *Id.* at 194-95. Looking for such an intent in *Sabo*, however, Judge Seitz, writing for the Court, stated that we could discern "no indication, through legislative intent or judicial interpretation, that Pennsylvania's non-recognition of a private remedy under the UIPA represents a reasoned state policy of exclusive administrative enforcement or that the vindication of UIPA norms should be limited or rare." *Id.* at 195.

One year later, the Supreme Court in *Humana Inc. v.*

12

*Forsyth*, 525 U.S. 299 (1999), provided an authoritative explanation of the phrase "invalidate, impair, or supersede," as once again RICO was the basis for a McCarran-Ferguson Act challenge. At issue in *Humana* was the impact civil RICO would have on the Nevada state insurance system. The Court noted that in Section 2(b) of the Act Congress was attempting to control the interplay between the federal and state laws not yet written. "In § 2(b) of the Act . . . Congress ensured that federal statutes not identified in the Act or not yet enacted would not automatically override state insurance regulation. Section 2(b) provides that when Congress enacts a law specifically relating to the business of insurance, that law controls." *Id.* at 307. In charting the scope of Section 2(b), the Court rejected the view that "Congress intended to cede the field of insurance regulation to the States, saving only instances in which Congress expressly orders otherwise." *Id.* at 308. At the same time that it rejected any notion of field preemption, it also rejected "the polar opposite of that view, i.e., that Congress intended a green light for federal regulation whenever the federal law does not collide head on with state regulation." *Id.* at 309. With those extremes rejected, the Supreme Court established the following formulation for applying § 1012(b): "When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application." *Id.* at 310.

Noting that there was no direct conflict with Nevada's state regulation, the Supreme Court then examined a variety of factors to assess the impact of RICO. The Court began by

13

noting that "Nevada provides both statutory and common-law remedies to check insurance fraud." *Humana*, 525 U.S. at 311. In addition to the administrative penalties that could be imposed on violators, "[v]ictims of insurance fraud may also pursue private actions under Nevada law." *Id.* at 312. "Moreover, the Act is not hermetically sealed; it does not exclude application of other state laws, statutory or decisional. Specifically, Nevada law provides that an insurer is under a common-law duty to negotiate with its insureds in good faith and to deal with them fairly." *Id.* at 312 (quotations omitted).

The Supreme Court also cited both the availability of punitive damages, *id.* at 313, and the scope of those damages. The Court noted that "plaintiffs seeking relief under Nevada law may be eligible for damages exceeding the treble damages available under RICO." *Id.* Concluding, the Court wrote that it saw

> no frustration of state policy in the RICO litigation at issue here. RICO's private right of action and treble damages provision appears to complement Nevada's statutory and common-law claims for relief. In this regard, we note that Nevada filed no brief at any stage of this lawsuit urging that application of RICO to the alleged conduct would frustrate any state policy, or interfere with the State's administrative regime. We further note that insurers, too, have relied on the statute when they were the fraud victims.

*Id.* (citation omitted).

14

In sum, the *Humana* analysis explored the specific interplay between RICO and the state insurance scheme. As described above, the non-exclusive list of factors the Court examined in *Humana* included the following: (1) the availability of a private right of action under state statute; (2) the availability of a common law right of action; (3) the possibility that other state laws provided grounds for suit;[5] (4) the availability of punitive damages; (5) the fact that the damages available (in the case of Nevada, punitive damages) could exceed the amount recoverable under RICO, even taking into account RICO's

---

[5]A feature of the procedural history in this case raises an oddity regarding the role of other state laws in the *Humana* framework. As noted *supra*, Weiss originally brought state-law claims in New Jersey state court, including claims under the CFA. His suit was removed to federal court based on ERISA preemption and Weiss did not challenge the removal. In light of ERISA, the state-law claims were dismissed, and eventually the ERISA claims were also dismissed, leaving only the federal RICO claims. We find ourselves resorting to state-law theories and claims as justification for the application of civil RICO, despite the fact that those claims would be preempted by ERISA. As this quirk did not trouble the Court in *Humana*, we will not explore it further. *See Humana*, 525 U.S. at 304 n.4 ("The complaint also presented claims under the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 829, as amended, 29 U.S.C. § 1001 et seq., and § 2 of the Sherman Act, 26 Stat. 209, as amended, 15 U.S.C. § 2. The disposition of those claims is not germane to the issue on which this Court's review was sought and granted.").

15

treble damages provision; (6) the absence of a position by the State as to any interest in any state policy or their administrative regime; and (7) the fact that insurers have relied on RICO to eradicate insurance fraud. *Humana*, 525 U.S. at 311-314.

In *Highmark, Inc. v. UPMC Health Plan*, 276 F.3d 160 (3d Cir. 2001), we relied on those same factors in holding that the McCarran-Ferguson Act did not bar a false advertising claim under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), by an insurer against another insurer in Pennsylvania. Canvassing the same Pennsylvania insurance scheme at issue in *Sabo*–the UIPA–we noted the availability of a common law right of action and that no private right of action was provided under the UIPA. *Highmark*, 276 F.3d at 168. We noted that suit could be brought under other state laws–specifically the Pennsylvania Unfair Trade Practices Consumer Protection Law, *id.*,–and that punitive damages were available. We also found that "[p]unitive damages can easily meet, if not exceed, Lanham Act damages." *Id.* at 170. No brief by the Commonwealth was made part of the record, and "although the cases did not discuss possible McCarran-Ferguson preclusion, this Court, and the District Courts in this Circuit, have routinely exercised jurisdiction over Lanham Act claims involving the insurance industry." *Id.* at 170 n.2. The balance of these factors confirmed that the state insurance scheme was not intended to be exclusive, that the allowance of the Lanham Act claim would not frustrate any state policy, nor would the Lanham Act interfere with the administrative scheme. Indeed, we found that "[n]ot only does the Lanham Act not invalidate, impair, or supersede the UIPA, or interfere with the State Commissioner's enforcement of its provisions, it also supports

16

the State's efforts to correct such practices by allowing private actions in the federal courts." *Id.* at 59.

With this background and these principles in mind, we turn now to the case before us. The District Court concluded that the New Jersey scheme was far more limited than the Nevada scheme that the Supreme Court had found compatible with RICO in *Humana*, and accordingly held that the RICO claims were barred by Section 2(b). The District Court reviewed the New Jersey regulatory scheme and found several reasons why RICO would "frustrate . . . declared state policy or interfere with [New Jersey's] administrative regime." *Weiss v. First Unum Life Ins. Co.*, 416 F. Supp. 2d 298, 301 (D.N.J. 2005). New Jersey's Insurance Trade Practices Act ("ITPA") regulates the business of insurance in New Jersey, and ITPA has no private right of action for insureds. Nor does ITPA provide for punitive damages.

The District Court acknowledged that a "common law cause of action sounding in contract has been recognized by the New Jersey Supreme Court for bad-faith failure to pay an insured's claim." *Weiss*, 416 F. Supp 2d at 302. However, it found that the presence of the common-law cause of action did not tip the scales in favor of allowing RICO claims because the New Jersey Supreme Court had fashioned the claim in the absence of any statutory remedy. The District Court hinted that the fact that the New Jersey legislature did not respond to the decision by the New Jersey Supreme Court by adding a new statutory apparatus reflected a desire to limit private remedies. The District Court did not address whether insurers rely on RICO to vindicate their interests when they are fraud victims.

17

The District Court concluded its analysis by stating:

> It is clear that neither New Jersey case law nor statutory law permits a private right of action for nonpayment of benefits, nor do they provide for an award of punitive damages. The differences in New Jersey's ITPA from the Nevada statute thus distinguish this case from Humana where the Supreme Court found that 'RICO's private right of action and treble damages provision appears to complement Nevada's statutory and common-law claims for relief.' *Humana*, 525 U.S. at 313. As a result, application of the federal RICO statute would frustrate the stated policies of New Jersey's ITPA and interfere with the State's administrative regime          .

*Weiss*, 416 F. Supp. 2d at 303.

The District Court added a footnote: "Although, to the Court's knowledge, New Jersey has filed no brief at any stage of the suit arguing that application of RICO would frustrate any state policy, the Supreme Court's citation of Nevada's failure to do so in *Humana* was clearly not the dispositive factor." *Id*. n.2.

Weiss urges on appeal that the District Court erred as a matter of law in failing to recognize that New Jersey has "long favored and approved cumulative private and public remedies to combat unfair insurance practices and insurance fraud." Appellant's Br. 14. Weiss argues that there is no state policy mandating the exclusivity of the ITPA as a remedy for insurance

18

frauds, and that the absence of a statutory right of action is not dispositive under *Humana*. Moreover he argues that ITPA is complemented, not impaired, by the presence of civil RICO. Weiss also relies on our pre-*Humana* decision in *Sabo* where we found "no indication, through legislative intent or judicial interpretation, that Pennsylvania's non-recognition of a private remedy under the UIPA represents a reasoned state policy of exclusive administrative enforcement or that the vindication of UIPA norms should be limited or rare." *Sabo,* 137 F.3d at 195.

First Unum urges that allowing RICO claims such as Weiss's would frustrate New Jersey's comprehensive system of laws regulating the insurance industry. First Unum's reading of *Humana* is that the "McCarran-Ferguson Act precludes a RICO action in a case such as this unless the applicable state insurance law permits an aggrieved policy holder or beneficiary to seek recovery of damages similar in nature to those permitted under RICO." Respondents' Br. 19-20. Similarly it argues that McCarran-Ferguson "precludes a Federal RICO action unless the law of the state in which the RICO action is filed provides for recovery of damages analogous to those provided by RICO," Respondents' Br. 14, and that analogous damages are not available in New Jersey.

We review the District Court's decision de novo,[6] *see*

---

[6] The McCarran-Ferguson inquiry is not a state-law question. Rather, it is a question about the interaction between a federal law and a state insurance system. The analysis as to whether the state system is invalidated, impaired, or superseded by the

19

*Highmark*, 276 F.3d at 166, and as we did in *Highmark*, we must assess the impact of the federal law in question in light of the *Humana* factors. The District Court's decision relied principally on four of the *Humana* factors: whether a private right of action was available under state statute; whether other state laws provided grounds for suit; whether punitive damages were available; and whether punitive damages available exceeded the amount recoverable under RICO. The District Court conceded that there was a common law right to sue, but it found dispositive the fact that New Jersey's regime lacked a private right of action. It relied on the fact that no punitive damages were available, and on the fact the scope of damages under RICO was far greater than under the state regime. In addition, it noted that it believed that another state law, the Consumer Fraud Act (CFA), did not apply to payment or nonpayment of insurance benefits under existing New Jersey Law. *Weiss*, 416 F. Supp. 2d at 302. Finally, it noted in a footnote that New Jersey had filed no brief at any stage of the litigation. As we set forth below, we believe the proper analysis leads to a different conclusion. We begin with an overview of ITPA, and will examine the component parts of the New Jersey regulatory scheme as they relate to claims such as this.

ITPA empowers a Commissioner to "examine and investigate into the affairs of every person engaged in the business of insurance in this State in order to determine whether such person has been or is engaged in any unfair method of

---

federal law is a question of federal law. *See Humana*, 525 U.S. at 311-14.

competition or in any unfair or deceptive act or practice prohibited by . . . this act." N.J. Stat. § 17:29B-5. This includes unfair claim-settlement practices, such as "[r]efusing to pay claims without conducting a reasonable investigation based upon all available information," § 17:29B-4(9)(d), and "[n]ot attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear," N.J. Stat. § 17:29B-4(9)(f). If after conducting a hearing the commissioner concludes that the business practice violates ITPA's provisions, the commissioner "shall make his findings in writing and shall issue and cause to be served upon the person charged with the violation an order requiring such person to cease and desist from engaging in such method of competition, act or practice." § 17:29B-7(a). The commissioner may also "order payment of a penalty not to exceed $ 1,000.00 for each and every act or violation unless the person knew or reasonably should have known he was in violation of this chapter, in which case the penalty shall be not more than $ 5,000.00 for every act or violation." *Id.*

The powers to investigate violations are not entirely within the Commissioner's discretion. "A person aggrieved by a violation of this act may file a complaint with the Commissioner of Banking and Insurance. Upon receipt of the complaint, the commissioner *shall* investigate an insurer to determine whether the insurer has violated any provision of this act." § 17:29B-18 (emphasis added). After such investigation, the Commissioner may "order an insurer that is in violation to pay a monetary penalty of $ 5,000 for each violation," § 17:29B-18b(1), "order the insurer to make restitution to the aggrieved person,"§ 17:29B-18b(2), or "obtain equitable relief

21

in a State or federal court of competent jurisdiction against an insurer, as well as the costs of suit, attorney's fees and expert witness fees," § 17:29B-18b(3). Aside from these forms of relief available, ITPA explicitly notes that its penalties are not intended to be exclusive. "The powers vested in the commissioner by this act shall be additional to any other powers to enforce any penalties, fines or forfeitures authorized by law with respect to the methods, acts and practices hereby declared to be unfair or deceptive." § 17:29B-12. In sum, the New Jersey system is best seen as limited, regulating without setting forth private remedies yet not explicitly or implicitly excluding other remedies.

### (1) Statutory Private Right of Action.

The parties agree that there is no private right of action under ITPA, but differ as to the implications of this conclusion. First Unum urges that this absence is the legislature's intention; Weiss urges that the lack of the provision is simply the product of a legislative impasse. (The New Jersey Supreme Court in *Pickett v. Lloyd's*, 621 A.2d 445 (N.J. 1993), noted that "on the score of whether we should recognize a [common law] remedy for the wrong, we realize that legislation has been proposed to provide such a remedy, but has not yet passed." 621 A.2d at 452 (citing New Jersey legislative record)). The parties do agree, however, that the "absence of a private cause of action under the ITPA does not end the inquiry," Respondents' Br. 43, and First Unum acknowledges that ITPA itself conceives of its penalties working in tandem with others. *See* § 17:29B-12 ("The powers vested in the commissioner by this act shall be additional to any other powers to enforce any penalties, fines or forfeitures

22

authorized by law with respect to the methods, acts and practices hereby declared to be unfair or deceptive.").  Accordingly, we view the absence of a private right of action in ITPA as an obstacle to Weiss's claim, but by no means an insurmountable one.

### (2) Common Law Right.

The parties agree that New Jersey provides a common law right of action against insurers for the recoupment of wrongly withheld benefits.  In *Pickett v. Lloyd's*, 621 A.2d 445 (N.J. 1993), the New Jersey Supreme Court "recognize[d] a remedy for bad-faith refusal" of benefits, despite the absence of New Jersey statutory law that would provide such a remedy.  *Id.* at 452.  The fact that this is one of the few recognized methods for recoupment of benefits outside the administrative apparatus is urged by the parties as pointing to opposite conclusions.  Weiss claims this shows that RICO would not disturb the administrative regime, while First Unum argues that the legislature's decision not to enact a statutory right of action after *Pickett* reflects a desire for a limited remedial scheme.  Nevertheless, it is undisputed that a common-law right of recovery is available in New Jersey.

### (3) Other State Laws.

We noted in *Sabo* that treble damages were available under other Pennsylvania statutes, and that this undercut the argument that the insurance scheme was intended to be exclusive.  "Pennsylvania courts have held that the state's general consumer protection statute . . . provides a private

23

remedy and treble damages for victims of insurance fraud. This certainly undercuts any purported balance struck by the Pennsylvania legislature favoring administrative enforcement to the exclusion of private damages actions and we see no reason why a federal private right of action cannot coexist with the UIPA in these circumstances." *Sabo*, 137 F.3d at 195 (citation omitted).

Similarly, the New Jersey Consumer Fraud Act (CFA) makes treble damages available to redress violations. By its terms, the CFA prohibits:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, *in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid*, whether or not any person has in fact been misled, deceived or damaged thereby . . . .

N.J. Stat. Ann. § 56:8-2 (emphasis added).

The only question is whether the scheme Weiss alleges is covered by the CFA. If it is, that would likewise undercut any purported objection by the New Jersey legislature to the award of treble damages under RICO. The CFA states that the term "'merchandise' shall include any objects, wares, goods,

24

commodities, services or anything offered, directly or indirectly to the public for sale." N.J. Stat. § 56:8-1(c). In *Lemelledo v. Benefit Management Corp.,* 696 A.2d 546 (N.J. 1997), the New Jersey Supreme Court applied the CFA to the practice of "loan packing," a "practice on the part of commercial lenders that involves increasing the principal amount of a loan by combining the loan with loan-related services, such as credit insurance, that the borrower does not want," 696 A.2d at 548. In *Lemelledo*, the New Jersey Supreme Court found that the "CFA simply complements" other New Jersey statutes, including ITPA. *Id.* at 555. In so doing, the Court discussed whether allowing a cause of action for fraud in the sale of insurance would conflict with the New Jersey regulatory scheme regarding insurance, undertaking an inquiry into whether "because lenders offering credit insurance are regulated by several State agencies, to subject them to CFA liability would run counter to our traditional reluctance to impose potentially inconsistent administrative obligations on regulated parties." 696 A.2d at 552. It concluded that it would not, stating that in "the modern administrative state, regulation is frequently complementary, overlapping, and comprehensive. Absent a nearly irreconcilable conflict, to allow one remedial statute to preempt another or to co-opt a broad field of regulatory concern, simply because the two statutes regulate the same activity, would defeat the purposes giving rise to the need for regulation." *Id.* at 554. In speaking specifically about the nature of the "conflict," it stated that courts must be "convinced that the other source or sources of regulation deal specifically, concretely, and pervasively with the particular activity, implying a legislative intent not to subject parties to multiple regulations that, as applied, will work at cross-purposes. We stress that the conflict must be patent and

25

sharp, and must not simply constitute a mere possibility of incompatibility." *Id.* This was because if "the hurdle for rebutting the basic assumption of applicability of the CFA to covered conduct is too easily overcome, the statute's remedial measures may be rendered impotent as primary weapons in combatting clear forms of fraud simply because those fraudulent practices happen also to be covered by some other statute or regulation." *Id.* The *Lemelledo* Court noted that two decisions by the Superior Court of New Jersey, *e.g. Nikiper v. Motor Club of America*, 557 A.2d 332 (N.J. Super. Ct. App. Div. 1989), *Pierzga v. Ohio Cas. Group of Ins. Cos.*, 504 A.2d 1200 (N.J. Super. Ct. App. Div. 1986), suggested that the CFA did not apply to the denial of insurance benefits, but the *Lemelledo* Court expressly took no position about this issue, or as to the continued viability of these cases. *See Lemelledo*, 696 A.2d at 551 n.3.[7] Though *Lemelledo* dealt only with fraudulent sale of insurance as part of loan packages as opposed to the defrauding of benefits themselves, the District Court derived from *Lemelledo* the conclusion that the defrauding of benefits was not covered by the CFA.

---

[7]Only *Pierzga* is truly on point, and to the extent that *Pierzga* relied on *Daaleman v. Elizabethtown Gas Co.*, 390 A.2d 566 (N.J. 1978), for the proposition that the CFA should not apply in the face of extensive regulation by a state agency (there, the state utility commission), we think it is clear from the expansive language and reasoning in *Lemelledo* that the New Jersey Supreme Court would view the instant situation differently. Neither case discusses the concept of fraud in connection with "performance" under the CFA that we discuss *infra*.

We are not so sure. We do not share the District Court's conviction that the CFA and its treble damages provision are inapplicable to schemes to defraud insureds of their benefits. The CFA prohibits the "act, use or employment by any person of any unconscionable commercial practice . . . in connection with . . . the subsequent performance of such person as aforesaid." N.J. Stat. Ann. § 56:8-2. Here, Weiss has alleged that First Unum embarked on a fraudulent scheme to deny insureds their rightful benefits, clearly an unconscionable commercial practice in connection with the performance of its obligations subsequent to the sale of merchandise, i.e. payment of benefits. The CFA covers fraud both in the initial sale (where the seller never intends to pay), and fraud in the subsequent performance (where the seller at some point elects not to fulfill its obligations).[8] We conclude that while the New Jersey Supreme Court has been silent as to this specific application of CFA, its sweeping statements regarding the application of the CFA to deter and punish deceptive insurance practices makes us question why it would not conclude that the performance in the

[8]The former scenario involves "a true con artist [who]. . . does not intend to perform his undertaking, the contract or whatever; he means to pocket the entire contract price without rendering any service in return." *United States v. Schneider*, 930 F.2d 555, 558 (7th Cir. 1991). The latter "involv[es] no deceit in the initial contract procurement, but fraud in its performance, as a party trying to protect its profit margin stops complying with certain contract specifications while at the same time falsely representing strict compliance." *United States v. Canova*, 412 F.3d 331, 353 n.22 (2d Cir. 2005).

27

providing of benefits, not just sales, is covered, so that treble damages would be available for this claim under the CFA.

**(4)-(5) Availability of Punitive Damages and Scope of Possible Damages.**

New Jersey law also appears to be unclear as to whether punitive damages are available against insurance companies on facts such as these. Weiss contends that *Pickett* left the door open for punitive damages to be awarded in a suit based on common law. While *Pickett* stated that "wrongful withholding of benefits . . . does not thereby give rise to a claim for punitive damages," 621 A.2d at 455, it nonetheless indicated that on some fact patterns a cause of action independent from the bad-faith denial of benefits could be sustained: "Carriers are not insulated from liability for independent torts in the conduct of their business. For example, '[d]eliberate, overt and dishonest dealings,' insult and personal abuse constitute torts entirely distinct from the bad-faith claim." *Id.* (quoting *Farr v. Transamerica Occidental Life Ins. Co.*, 699 P.2d 376, 383 (Ariz. 1984)). Further, the *Pickett* Court added that "in order to sustain a claim for punitive damages, a plaintiff would have to show something other than a breach of the good-faith obligation as we have defined it." *Id.* The parties have argued whether a racketeering scheme constitutes conduct so wrongful as to warrant punitive damages. We think it is at the very least arguable that a racketeering scheme by an insurer against its insureds would constitute a distinct and egregious tort under New Jersey law.

**(6) Presence or Absence of State Brief.**

28

Although the State of New Jersey has not informed us of any "declared state policy," the District Court found a limiting policy implicit in the structure of the New Jersey scheme, and found it would be frustrated and impaired by RICO. First Unum, taking a cue from the District Court, argues that the decision by the state legislature not to amend the ITPA to provide a statutory right of action after *Pickett* was decided weighs against allowing the RICO suit. "The absence of such a [statutory] claim . . . is the product of a reasoned and declared public policy of the state of New Jersey." Respondents' Br. 24 (citing *Pickett*). We conclude that the inferences to be drawn from legislative action (and inaction) are not so clear. Further, one would have assumed that such a "reasoned and declared public policy" would have led to New Jersey's voicing its interest at every stage of the instant litigation. That has not happened. The fact that ITPA was not amended after *Pickett* could mean that the state legislature believed the common law remedy adequate; it could also mean that it assumed that RICO would apply and therefore that remedy was adequate as well. Or, other legislative priorities could have taken precedence. In short, there is no "declared state policy" conspicuous from the structure of New Jersey law or the pattern of legislative history. We can draw no specific conclusion from New Jersey's silence; if anything, it weighs against First Unum.

### (7) Reliance by State Insurers.

There is no evidence in the record as to the reliance by state insurers on federal civil RICO provisions in New Jersey. But it is logical to assume, as the Supreme Court did in *Humana*, that deeming federal civil RICO suits to be

29

unavailable because they would impair the state scheme would deprive insurers of an important weapon of self-defense. *See Humana*, 525 U.S. at 314 ("We further note that insurers, too, have relied on the statute when they were the fraud victims."); *see also* Eric Beal, Note, *It's Better to Have Twelve Monkeys Chasing You Than One Gorilla:* Humana Inc. v. Forsyth, *the McCarran-Ferguson Act, RICO, and Deterrence*, 5 CONN. INS. L.J. 751, 776 (1998-99) ("Paradoxically, if Humana Inc. had prevailed [insurers] might have hampered the insurance industry's ability via RICO to 'fight back' against fraud committed by policyholders. RICO has been described as being 'the single most valuable tool available to insurers through the American jurisprudence system.' Insurers have brought RICO actions for fraud against policyholders, attorneys, and other insurance companies.") (citations and footnotes omitted). We find that depriving all players in the New Jersey insurance scheme of the right to sue under RICO is not part of the state's declared insurance policy, and we cannot simply presume such an atypical legislative aim from the structure of New Jersey's insurance laws.

Examining the above factors in this case as compared to *Humana*, it is clear that the aspects of the Nevada scheme presented a clearer case, and it might even be said that the finding by the unanimous Court that the two schemes "complement[ed]" each other, *Humana*, 529 U.S. at 313, was not subject to serious debate. Here, the allowance of treble damages, or punitive damages analogous to the treble damages available under RICO, is not as clear. The issue, then, is whether the absence of extensive legislative regulation of claims against insurers or provision of remedies, coupled with judicial

30

sanctioning of certain remedies for bad faith denials of benefits, indicates that RICO would impair the state regulatory scheme. We think not. There is nothing in the regulatory scheme that indicates that allowing other remedies as part of its regulation of insurance would frustrate or interfere with New Jersey's insurance regime. To the contrary, the legislation permits additional remedies, *see* § 17:29B-12, and the New Jersey courts have felt free to fashion them. Moreover, the New Jersey Supreme Court's reasoning in *Lemelledo* in connection with the CFA points to encouraging, rather than limiting, other remedies in this area.

Furthermore, as Judge Seitz noted in *Sabo*, RICO embodies federal policies of an expansive nature. *See Sabo*, 137 F.3d at 194 (discussing "federal policies embodied in RICO, namely, the grant of a liberal federal remedy"); *see also Sedima v. Imrex Co.*, 473 U.S. 479, 498 (1985) ("RICO was an aggressive initiative to supplement old remedies and develop new methods for fighting crime."). The need for this type of regulation was not contemplated when McCarran-Ferguson was enacted. We should be wary of underestimating the significance of these federal policies and should not go out of our way to find impairment of a state scheme when such impairment is not clear.

Also, we find nothing in cases from other Courts of Appeals dealing with different state schemes governing insurers that would cause us to alter our view in this case. In *American Chiropractic v. Trigon Healthcare*, 367 F.3d 212 (4th Cir. 2004), *cert. denied,* 543 U.S. 979 (2004), the Fourth Circuit upheld the application of RICO in Virginia despite the absence of a private right of action in the state insurance regime for

31

reasons corresponding closely to those we rely on. While the Tenth Circuit in *Bancoklahoma Mortgage Corp. v. Capital Title Co.*, 194 F.3d 1089 (10th Cir. 1999), followed a similar path and upheld the application of RICO in Missouri despite the absence of a private right of action under the state regime, the Eighth Circuit has held that RICO would impair Minnesota's insurance system. In *Doe v. Norwest Bank Minn.*, *N.A.*, 107 F.3d 1297 (8th Cir. 1997), the Eighth Circuit discussed the absence of a private right of action under Minnesota's scheme, as well as the severe civil RICO penalties, and concluded that "[Appellee] makes a compelling case that the extraordinary remedies of RICO would frustrate, and perhaps even supplant, Minnesota's carefully developed scheme of regulation." *Id*. at 1307-08. The Eighth Circuit concluded on the basis of evidence before it that the "state of Minnesota . . . determined that its insurance market can best be regulated by the Commissioner's pursuit of fines and injunctive relief." *Doe,* 107 F.3d at 1307.[9] We do not find that true of New Jersey. Here we have no stated fear of "extraordinary" remedies, or declaration that the insurance market or economic policy–as it pertains to insurance premiums, benefits, and the allocation of risk–would be adversely affected. There is nothing of record in this case that suggests that the availability of RICO would disrupt the playing field in the state insurance regime beyond what was clearly intended by state law.

After canvassing the *Humana* factors, we are left with the

---

[9]That approach was reaffirmed with little discussion post-*Humana* in *LaBarre v. Credit Acceptance Corp.*, 175 F.3d 640 (8th Cir. 1999).

firm conviction that RICO does not and will not impair New Jersey's state insurance scheme. Though RICO is a powerful tool, we conclude as the Supreme Court did in *Humana* that "we see no frustration of state policy in the RICO litigation at issue here." 525 U.S. at 313. Indeed, in light of the common law and statutory remedies available, we do not read New Jersey's scheme as intended to be exclusive. Nor do we find that RICO will disturb or interfere with New Jersey's state insurance regime. RICO's provisions supplement the statutory and common-law claims for relief available under New Jersey law. We conclude that RICO augments New Jersey's insurance regime; it does not impair it.

## CONCLUSION

For the reasons set forth above, and in light of the facts described, we find that the McCarran-Ferguson Act does not bar Weiss's civil RICO claim. The decision of the District Court will be reversed and the case remanded for proceedings not inconsistent with this opinion.